JOHN S. HANNAH

v.

THE PEOPLE ex rel. Attorney General.

*Opinion filed June 19, 1902—Rehearing denied October 16, 1902.*

1. PRACTICE—*when suit does not abate by death of party.* A proceeding for contempt in violating an injunction is a civil remedy and is ancillary to the proceeding in which the injunction was granted, and as the suit does not abate upon the death of the defendant, the executor may be substituted, on motion.

2. WAREHOUSES—*public warehousemen pursue a public employment.* Under the constitution, and the act of 1871 adopted in obedience thereto, public warehouses licensed under such act are public agencies, and the licensees are regarded as pursuing a public employment and as charged with the performance of public duties.

3. SAME—*public warehouseman must not be disqualified by reason of personal interest.* The law implies, as a condition to the acceptance of a license to conduct a public warehouse, that the licensee be not disqualified upon any ground of interest adverse to those whom he undertakes to serve, and that he will remain disinterested while he occupies such relation to the public.

4. SAME—*the mixing by a warehouseman of his own grain with that of others is incompatible with public duties.* The right of a public warehouse keeper to store his own grain and mix it with the grain of others which he may decide is of like grade with his own, and to issue and buy warehouse receipts representing his own grain, is incompatible with the faithful discharge of his duties to the public.

5. SAME—*act of 1897, concerning public warehouses, is unconstitutional.* The denial of the right of a public warehouseman to buy and store his own grain, mix and grade it in his own warehouse, has its basis in the inhibitions clearly implied in the constitution, and hence the act of 1897, (Laws of 1897, p. 300,) which purports to authorize class "A" warehousemen to do such acts upon giving notice of their intention to the chief grain inspector, is invalid.

6. CONSTITUTIONAL LAW—*that which is enjoined by the constitution must be obeyed.* That which is enjoined by fair implication from the constitutional provisions must be obeyed by the law-making department of the State, and any attempted substitution by the legislature of something as the equivalent of that which is enjoined is an assumption by it of power which rests in the people.

7. SAME—*legislature cannot change public policy indicated by constitution.* Public policy may be indicated by the constitution of the State, and in such case the right to change such policy cannot be exercised by the legislature.

WILKIN and CARTER, JJ., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding.

CUSTER, GODDARD & GRIFFIN, and JAMES E. MUNROE, for appellant:

The question whether a law be void for its repugnancy to the constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear conviction of their incompatibility with each other. *Fletcher* v. *Peck*, 6 Cranch, 87.

The legislature of this State can do any legislative act that is not prohibited by the State or Federal constitution, and, without and beyond the limitations and restrictions contained in these instruments, the law-making power of the State is as absolute, omnipotent and uncontrollable as that of the English parliament. *People* v. *Hill*, 163 Ill. 191; *Richards* v. *Raymond*, 92 id. 612; *People* v. *Hoffman*, 116 id. 587; *Mason* v. *Wait*, 4 Scam. 127; *People* v. *Wall*, 88 Ill. 75; *Hawthorn* v. *People*, 109 id. 302.

The whole legislative power is vested by the constitution in the General Assembly, composed of two houses, the members of each to have certain qualifications and to be elected by the people. Every subject within the domain of legislation and within the scope of civil government, not withdrawn from it by the constitution of the State or of the United States, can be dealt with by that body by general laws to affect the whole State and all the people within it. That body is, emphatically, the guardian of the public interests and welfare, and would

be derelict in its duty did it fail to exercise all its powers to their promotion and protection. That body is the sole judge of such measures as may advance the interests of the people. *Munn* v. *People*, 69 Ill. 88.

It is to be presumed that the General Assembly, before it adopted the amendatory act, duly weighed and considered all facts bearing upon the question involved, and determined that the true policy of the State would be subserved by the adoption of that act. *Railroad Co.* v. *Casey*, 26 Pa. St. 287; *Johnson* v. *Railroad Co.* 23 Ill. 203; Black on Constitutional Law, sec. 32; *Lusher* v. *Scites*, 4 W. Va. 11.

It is the legislative, and not the judicial, power in the State that must control and give shape to its public policy. Courts can only ascertain and observe that policy, and apply it to cases as they arise, without changing or obstructing it. *Carroll* v. *East St. Louis*, 67 Ill. 568.

As a general rule, the immediate representatives of the people, in legislature assembled, would seem to be the fairest exponents of what public policy requires, as being most familiar with the habits and fashions of the day and with the actual condition of commerce and trade, and their consequent wants and weaknesses. *Kellogg* v. *Larkin*, 3 Pinney, 136.

The public policy of the government is to be found in its statutes, and when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials. But when the law-making power speaks upon a particular subject over which it has constitutional power to legislate, public policy, in such a case, is what the statute enacts. If the law prohibit any contract or combination in restraint of trade or commerce, a contract or combination made in violation of such law is void, whatever may have been theretofore decided by the courts to have been the public policy of the country on that subject. *United States* v. *Freight Ass.* 166 U. S. 294.

H. J. HAMLIN, Attorney General, and HENRY S. ROBBINS, for appellee:

When the identical thing delivered is to be restored, though in an altered form, the contract is one of bailment and the title to the property is not changed; but when there is no obligation to restore the specific thing, and the receiver is at liberty to return another thing of equal value, he becomes a debtor to make the return, and the title of the property is changed—it is a sale. Jones on Bailments, 102; Story on Bailments, sec. 439; *Chase* v. *Washburn,* 1 Ohio, 244; *Smith* v. *Clark,* 21 Wend. 24; *Wilson* v. *Cooper,* 10 Iowa, 565; *Lonergan* v. *Stewart,* 55 Ill. 44; *Carlisle* v. *Wallace,* 12 Ind. 252; *Norton* v. *Woodruff,* 2 N. Y. 155; *Ewing* v. *French,* 1 Blackf. 353.

This Illinois statute is a new departure. It for the first time in this State authorized warehousing where grain was mixed, and in doing so it created a class of *quasi* public agents and subjected them to State control. By force of this statute, and not otherwise, the grain of different depositors could, even without their consent, be mixed by the warehousemen and still remain the depositors' grain. This made a public warehouse of an entirely different kind from that of the common law.

Such was the state and progress of the law respecting grain-mixing warehouses at the time the constitutional convention of 1870 met. In it lies, in part, the history of the growth of the idea of grain-mixing warehouses being public institutions or agencies, which, as we contend, has found expression in the constitution of 1870. Judge Cooley well said in *People* v. *Harding,* 53 Mich. 422: "As every constitution has its own history, it is likely to be more or less peculiar and must be interpreted in the light of said history." And in *Bay City* v. *State Treasurer,* 23 Mich. 191, that "public history of the times should have weight in arriving at such construction." This court has also held that the proceedings of the constitutional convention were to be looked to to aid

in the construction of a constitutional provision. *Wulff* v. *Aldrich*, 124 Ill. 591.

Mr. JUSTICE BOGGS delivered the opinion of the court:

This is an appeal by John S. Hannah from a judgment of the circuit court of Cook county adjudging him guilty of contempt and imposing a fine of $100 for violating a decree of that court enjoining him and other interested parties from storing in the public warehouse of the Central Elevator Company any grain directly or indirectly owned by or belonging to said elevator company or the firm of Carrington, Hannah & Co., (of which appellant was a member,) or in which said corporation or firm had any interest other than as public warehousemen. Upon information in chancery theretofore filed in said circuit court by the Attorney General against said Central Elevator Company and eight other companies, they, and each of them, their managers, agents and employees, had by the decree of said court been enjoined from storing and mixing their own grain with the grain of their customers in their own elevators. Appeals were taken from the decrees in those cases to this court, where they were affirmed. (*Central Elevator Co.* v. *People,* 174 Ill. 203.) While these appeals were under consideration in this court the legislature passed an act approved May 26, 1897, (Laws of 1897, p. 302,) amending section 6 of the Warehouse act of April 25, 1871, purporting to make it lawful for owners, lessees or managers of public warehouses of class "A" to store their own grain and mix it with the grain of others of the same grade in their own warehouses, on condition hereinafter set forth. After this act was adopted and after the decree was affirmed by this court, the appellant, as manager of the Central Elevator Company, and who was one of the owners of stock in said company, with full knowledge of said decree and its affirmance and of the perpetual injunction thereby granted, stored and continued to store the grain of the elevator company,

and of the co-partnership of which he was a member, in the warehouse of said company, claiming the right to do so under said amendatory act of 1897, but disclaiming any intent to violate the injunction of the court. In the proceedings instituted against Hannah as for contempt the circuit court held that the act of 1897 was unconstitutional and void, and entered the judgment and imposed the fine appealed from.

Since this case was taken under advisement by this court, the appellant, John S. Hannah, died, and his death having been suggested to the court, a motion was made by the Northern Trust Company that it be substituted, as his executor, as appellant. It has also been suggested that the appeal abated upon the death of said John S. Hannah, and if so, that the executor could not, of course, be substituted as a party in his stead. We are of the opinion that this cause has not abated. It is ancillary to the one in which the injunction was granted and partakes of its character. It is a civil remedy of the parties to enforce the decree, and is not criminal in its nature. (*People* v. *Diedrich*, 141 Ill. 665; *People* v. *Weigley*, 155 id. 491; *Lester* v. *People*, 150 id. 408.) The motion to substitute the executor, the Northern Trust Company, as appellant herein, is allowed.

Upon the merits the only question involved in the case is the constitutionality of said amendatory act of 1897. Careful consideration of this question has brought us to the conclusion that the provisions of the amendatory act are inconsistent with the spirit and purpose of the provisions of the constitution of 1870 with relation to public warehouses, and that the said act of 1897 must be declared inoperative for the reason it is in contravention of such constitutional provisions.

That the framers of the constitution deemed the matter of the protection of producers and shippers of grain against wrong, frauds and impositions on the part of those engaged in the business of providing storage for

grain of great importance, is demonstrated by the fact they devoted an entire article of the constitution to that subject. (Const. 1870, art. 13.) Sections 1, 2, 6 and 7 of said article 13 of the constitution are as follows:

"Sec. 1. All elevators or storehouses where grain or other property is stored for a compensation, whether the property stored be kept separate or not, are declared to be public warehouses.

"Sec. 2. The owner, lessee or manager of each and every public warehouse situated in any town or city of not less than 100,000 inhabitants, shall make weekly statements under oath, before some officer to be designated by law, and keep the same posted in some conspicuous place in the office of such warehouse, and shall also file a copy for public examination in such place as shall be designated by law, which statement shall correctly set forth the amount and grade of each and every kind of grain in such warehouse, together with such other property as may be stored therein, and what warehouse receipts have been issued, and are, at the time of making such statement, outstanding therefor; and shall, on the copy posted in the warehouse, note daily such changes as may be made in the quantity and grade of grain in such warehouse; and the different grades of grain shipped in separate lots shall not be mixed with inferior or superior grades without the consent of the owner or consignee thereof.

"Sec. 6. It shall be the duty of the General Assembly to pass all necessary laws to prevent the issue of false and fraudulent warehouse receipts, and to give full effect to this article of the constitution, which shall be liberally construed so as to protect producers and shippers. And the enumeration of the remedies herein named shall not be construed to deny to the General Assembly the power to prescribe by law such other and further remedies as may be found expedient, or to deprive any person of existing common law remedies.

"Sec. 7. The General Assembly shall pass laws for the inspection of grain, for the protection of producers, shippers and receivers of grain and produce."

In obedience to the mandates of the constitution, the General Assembly, at the session of 1871, adopted an act entitled "An act to regulate public warehouses and the warehousing and inspection of grain, and to give effect to article 13 of the constitution of this State," approved April 25, 1871. (3 Starr & Cur. Stat. p. 3316.) This enactment divided the public warehouses, as defined in article 13 of the constitution, wherein grain might or should be stored, into two classes, designated, respectively, as class "A" and class "B." Class "A" includes only such warehouses, elevators or granaries as are located in cities having not less than 100,000 inhabitants, and the act otherwise defined warehouses of this class as follows: "Public warehouses of class 'A' shall embrace all warehouses, elevators or granaries in which grain is stored in bulk, and in which the grain of different owners is mixed together, or in which grain is stored in such a manner that the identity of different lots or parcels can not be accurately preserved." The public warehouse of the Central Elevator Company is located in the city of Chicago, and is included in class "A." Section 3 of the act of 1871 provided that the owner, lessee or manager of any warehouse of class "A" should be required to procure from the circuit court of the county in which the warehouse is situated, a license authorizing such owner, lessee or manager to transact business as a public warehouseman. Section 6 of the act of 1871 is as follows, except the words italicized and placed in brackets:

"Sec. 6. It shall be the duty of every warehouseman of class 'A' to receive for storage any grain that may be tendered to him in the usual manner in which warehouses are accustomed to receive the same in the ordinary and usual course of business, not making any discrimination between persons, [*or between himself as the owner of grain*

*stored in such house and other persons,*] desiring to avail themselves of warehouse facilities,—such grain in all cases to be inspected and graded by a duly authorized inspector, and to be stored with grain of a similar grade, received at the same time, as near as may be. In no case shall grain of different grades be mixed together while in store; but, if the owner or consignee so requests, and the warehouseman consent thereto, his grain of the same grade may be kept in a bin by itself, apart from that of the owners; which bin shall, thereupon, be marked and known as a 'separate bin.' If a warehouse receipt be issued for grain so kept separate, it shall state, on its face, that it is in a separate bin, and shall state the number of such bin; and no grain shall be delivered from such warehouses unless it be inspected on the delivery thereof by a duly authorized inspector of grain. Nothing in this section shall be so construed as to require the receipt of grain into any warehouse in which there is not sufficient room to accommodate or store it properly, or in cases where such warehouse is necessarily closed. [*The proprietors, lessees or managers of public warehouses of class 'A' may store in any such warehouses owned, leased or managed by them grain of their own and mix it with the grain of others of like grade stored therein, and may purchase warehouse receipts representing grain on store in such warehouses owned, leased or managed by them; but when any such proprietor, lessee or manager shall desire to so store and mix his own grain in any such warehouse or warehouses owned, leased or managed by him, or to purchase receipts for grain on store therein, he shall so inform the chief inspector of grain of the county in which such warehouse or warehouses are located, and said chief inspector shall thereupon place and keep in such warehouse or warehouses, whenever necessary so to do, one or more assistant inspectors, who shall, in addition to their usual duties as assistant inspectors, have general supervision over the storing and care of the grain stored in such warehouse or warehouses under such rules and regulations as shall be made by the railroad and*

*warehouse commissioners; and said commissioners are hereby invested with full power and authority to make all rules and regulations concerning the storing, handling and delivery of grain in warehouses of class 'A,' in which the proprietors, lessees or managers thereof store their own grain, as may in their opinion be necessary to prevent any fraud upon or discrimination against other depositors of grain in their said warehouses and to prevent any proprietor, lessee or manager of such warehouses from securing to himself as the owner of grain stored therein any benefit or advantage over any other depositor of grain stored in such warehouse or warehouses.*"]

The act of 1897, here under consideration, amended said section 6 of the act of 1871 by inserting therein and adding thereto the italicized words enclosed in brackets, set forth above. Thus the original section and the section as amended may be readily distinguished.

Under the constitution of 1870, and the enactment of 1871, adopted in obedience to the constitutional requirements, public warehouses licensed under the act of 1871 are public agencies, and licensees under that act are to be regarded as pursuing a public employment and as charged with the performance of duties toward the public. In applying for and accepting their licenses such warehousemen voluntarily submitted their business and their property to the control of the law, to the end that the performance by them of their duties to the public might be accomplished and enforced. The constitution declares such warehouses shall be public warehouses. This constitutional provision impresses the business of keeping a public warehouse with a public use, and those who apply for and accept licenses to keep public warehouses under the act of 1871 voluntarily occupy a relation to those who store grain in their warehouses, or have the right to so store grain, which makes it incumbent upon such warehousemen to discharge certain duties to such owners and producers and shippers of grain. The license authorizes the warehouseman to pursue a public employ-

ment.  The law implies, as a condition of the accept-
ance of a license to conduct a public warehouse, that the
licensee is not disqualified upon any ground of interest
adverse to that of those whom, by the acceptance of the
license, he undertakes to represent and serve, from dis-
charging the duties of a public warehouseman, and that
he will remain so disinterested and qualified while he
holds that relation to the public.  Speaking upon that
subject, we said in *Central Elevator Co.* v. *People, supra,*
(p. 207):  "It is a firmly established rule that where one
person occupies a relation in which he owes a duty to
another, he shall not place himself in any position which
will expose him to the temptation of acting contrary to
that duty or bring his interest in conflict with his duty.
This rule applies to every person who stands in such a
situation that he owes a duty to another, and courts of
equity have never fettered themselves by defining par-
ticular relations to which, alone, it will be applied.  They
have applied it to agents, partners, guardians, executors,
administrators, directors and managing officers of cor-
porations, as well as to trustees, but have never fixed or
defined its limits.  The rule is founded upon the plain
consideration that the one charged with duty shall act
with regard to the discharge of that duty, and he will
not be permitted to expose himself to temptation or be
brought into a situation where his personal interests
conflict with his duty.  Courts of equity have never al-
lowed a person occupying such a relation to undertake
the service of two whose interests are in conflict, and
then endeavor to see that he does not violate his duty,
but forbid such a course of dealing irrespective of his
good faith or bad faith.  If the duty of the defendants
as public warehousemen stands in opposition to personal
interest as buyers and dealers in grain storing the same
in their own warehouses, then the law interposes a pre-
ventive check against any temptation to act from per-
sonal interest, by prohibiting them from occupying any

such position. The public warehouses established un-
der the law are public agencies, and the defendants, as
licensees, pursue a public employment. They are clothed
with a duty toward the public."

The rules of law applicable to the position and rela-
tion occupied by public warehousemen, and to their du-
ties, are the same that apply to trustees, and others
who occupy fiduciary relations. The law has established
limitations upon the power of those occupying such con-
fidential relation, to act in relation to the property and
the interests of those who are the rightful beneficia-
ries of the trust. One of the restrictions is that, in the
execution of the trust or fiduciary undertaking, duty and
interest must not come in conflict and the opportunity
for such conflict must not be permitted. This rule is
applicable to those who hold license under the constitu-
tional provisions and the provisions of the act of 1871,
which was enacted in pursuance of the command of the
constitution. Where it is evident a trustee has so con-
ducted the affairs of the trust and his personal affairs as
that a conflict between his duty and his personal inter-
est necessarily arose, the courts have uniformly held the
transactions constructively fraudulent. The rule is, not
only that frauds by trustees shall be prevented, but that
opportunity and temptation to fraud shall not be per-
mitted. (27 Am. & Eng. Ency. of Law, 200.) Speaking
of a phase of the principle involved in the case of the
purchase by a trustee of the trust property, we said in
*Thorp* v. *McCullum,* 1 Gilm. 614 (on p. 626): "The tempta-
tion of self-interest is too powerful and insinuating to be
trusted. Man cannot serve two masters; he will forsake
the one and cleave to the other. Between two conflict-
ing interests it is easy to foresee, and all experience has
shown, whose interests will be neglected and sacrificed.
The temptation to neglect the interest of those thus con-
fided must be removed, * * * for it would be impos-
sible, in many cases, to ferret out the secret knowledge

of facts and advantages of the beneficiary, known to the trustee or others acting in the like character. The best and only safe antidote is in the extraction of the sting. By denying the right to hold, the temptation and power to do wrong is destroyed."

In *Chicago Hansom Cab Co.* v. *Yerkes*, 141 Ill. 320, it was said (p. 333): "The rule is familiar that a trustee is disqualified to act by the intervention of a personal interest in the performance of his duties as trustee."

The remark of the chief justice in *Staats* v. *Bergen*, 2 C. E. Green, 554, that public policy required that a "trustee may not put himself in a position in which to be honest must be a strain on him," was quoted by this court with approval in *Tyler* v. *Sanborn*, 128 Ill. 136, and we there said, with reference to the rule as to conflict between the interest and the integrity of the trustee: "The rule is not merely remedial of wrong actually committed, —it is intended to be preventive of wrong." In *Galbraith* v. *Tracy*, 153 Ill. 54, we again quoted the observation of the court in *Staats* v. *Bergen*, *supra*, and applied the doctrine that trustees could not be allowed to occupy a position which placed their private interests in antagonism to their duties as trustees.

In *Hough* v. *Harvey*, 71 Ill. 72, an administrator, who was also an attorney, sought compensation for attorney's fees in defending an action against the estate and for services in procuring information deemed necessary for the defense, but his demand was disallowed in obedience to the doctrine which we there announced, that a trustee shall not be placed or allowed to place himself in a position "where his interest may be opposed by his duty." We there further said (p. 76): "The services, they say, consisted in making repeated journeys to ascertain most important facts and in finding the witnesses by whom they could be proven. It would have been within the powers and duty of the trustee to have employed an agent to make these repeated journeys. Then, his true

position of trustee would have required him to exercise a reasonable degree of care and vigilance in seeing that the journeys were necessary,—that they were not unnecessarily repeated or extended; but when he assumes to perform them himself he occupies an entirely different position. He thereby places himself in one where his interest may be opposed to his duty. If he have little to do and desires profitable occupation, and can call upon the estate to compensate him for his time and trouble, it would be against his own interest to restrict these journeys as to number or extent."

In *Gray* v. *Robertson*, 174 Ill. 242, the trustee in a trust deed, who was also a solicitor in chancery, asked that the decree foreclosing the trust deed, on a bill which he had prepared as solicitor, should order the solicitor's fee provided for in the trust deed to be paid, in case of foreclosure, to him. But this was denied, and we said (p. 251): "The duties and obligations of a trustee in a trust deed are so far incompatible with the duties and obligations of the solicitor of the creditor that a trustee cannot be permitted to charge and receive compensation as a solicitor in a cause in which he appears as a party, though in his capacity as trustee."

That the exercise of the right purported to be given to the keepers of public warehouses by the said amendatory act of 1897 to store their own grain in their own warehouses, mix it with any grain of others which they may decide is of like grade as their own grain, and issue and buy warehouse receipts representing or purporting to represent their own grain, etc., is incompatible with the fair, faithful and impartial discharge of the public employment of a keeper of a public warehouse, is well shown by the following extract from the opinion of this court in said *Central Elevator Co.* v. *People, supra* (p. 208): "The evidence shows that defendants, as public warehousemen storing grain in their own warehouses, are enabled to, and do, over-bid legitimate grain dealers

by exacting from them the established rate for storage, while they give up a part of the storage charges when they buy or sell for themselves. By this practice of buying and selling through their own elevators the position of equality between them and the public whom they are bound to serve is destroyed, and by the advantage of their position they are enabled to crush out, and have nearly crushed out, competition in the largest grain market of the world. The result is, that the warehousemen own three-fourths of all the grain stored in the public warehouses of Chicago, and upon some of the railroads the only buyers of grain are the warehousemen on that line. The grades established for different qualities of grain are such that the grain is not exactly of the same quality in each grade, and the difference in market price in different qualities of the same grade varies from two cents per bushel in the better grades to fifteen cents in the lower grades. The great bulk of grain is brought by rail and in car-loads and is inspected on the tracks, and the duty of the warehousemen is to mix the car-loads of grain as they come. Such indiscriminate mixing gives an average quality of grain to all holders of warehouse receipts. Where the warehouseman is a buyer, the manipulation of the grain may result in personal advantage to him. Not only is this so, but the warehouse proprietors often over-bid other dealers as much as a quarter of a cent a bushel, and immediately re-sell the same to a private buyer at a quarter of a cent less than they paid, exacting storage which more than balances their loss. In this way they use their business as warehousemen to drive out competition with them as buyers. It would be idle to expect a warehouseman to perform his duty to the public as an impartial holder of the grain of the different proprietors if he is permitted to occupy a position where his self-interest is at variance with his duty. In exercising the public employment for which he is licensed he cannot be permitted to use the advantage of his posi-

tion to crush out competition and to combine in establishing a monopoly, by which a great accumulation of grain is, in the hands of the warehousemen, liable to be suddenly thrown upon the market whenever they, as speculators, see profit in such course. The defendants are large dealers in futures on the Chicago Board of Trade, and together hold an enormous supply of grain ready to aid their opportunities as speculators. The warehouseman issues his own warehouse receipt to himself. As public warehouseman he gives a receipt to himself as individual, and is enabled to use his own receipts for the purpose of trade and to build up a monopoly and destroy competition. That this course of dealing is inconsistent with the full and impartial performance of his duty to the public seems clear." And further in the same cause we held it was inconsistent with the duties and obligations the said Central Elevator Company owed to the public, for it to buy grain and store the same in the public warehouse which it was licensed to conduct, and as public warehouseman to issue receipts or certificates for such grain to itself.

The amendatory act, which, as we have before said, was adopted while the said case of *Central Elevator Co.* v. *People*, *supra*, was under consideration in this court, by amending said section 6 of the act of 1871, as shown hereinbefore, purports to authorize warehousemen who, in virtue of licenses issued under section 3 of the act of 1871, are conducting public warehouses of class "A" for the storage of grain, to store grain of their own in such warehouses so conducted by them, and to mix such grain of their own with the grain of others of like grade stored in their warehouses, and to purchase warehouse receipts representing grain on store in their own warehouses, by giving notice to the chief inspector of grain of the county in which such warehouses are located, of their intention so to buy and store their own grain in their own warehouses. If we are right in holding as we did in *Central*

*Elevator Co.* v. *People, supra,* that a public warehouseman of class "A" could not, under the provisions of the constitution of 1870 and the provisions of the act of 1871, store his own grain in his own warehouse, grade the same and mix it with the grain stored there by his customers, we entertain no doubt it was beyond the power of the General Assembly to confer on such warehouseman the right and power to do so by the amendatory act of 1897. The ground of that decision was, that the privilege or course of dealing there denied to public warehousemen to store their own grain in their own warehouses was inconsistent with the full and impartial performance of the duty which a public warehouseman owed to the public. The duty there referred to as being required of a public warehouseman was created and imposed by the constitution of the State. The denial of the right of a warehouseman to buy and store his own grain in his own warehouse had its basis in the inhibition clearly implied by the constitution. It was manifestly beyond the power of the General Assembly, by the enactment of the amendatory act of 1897, to relieve public warehousemen of a duty charged upon them by the provisions of the constitution of the State, or to remove the inhibition clearly implied by the organic law.

The constitution is a limitation upon the power of the General Assembly, and the incorporation of the provisions in the constitution with reference to public warehouses was for the purpose of placing it beyond the authority of the General Assembly to relieve those who should engage in the business of conducting public warehouses from the discharge of their duties to the public. The manifest intent of the constitution is that its provisions should operate for the protection of producers and shippers of grain. Section 6 of the constitution declares it to be the duty of the General Assembly to pass all necessary laws to give full effect to the provisions of the constitution with relation to public warehouses, and

declares that such laws shall be liberally construed so as to protect producers and shippers of grain. The amendatory act is manifestly not for the protection of producers and shippers, but is against their interests, and has for its purpose the exemption of public warehousemen from the discharge of public duties imposed upon them for the protection of producers and shippers, the performance of which is clearly necessary to the protection of such interests of producers and shippers.

The constitution declares the warehouse of which the said Hannah was the manager, and, by virtue of his stock in the corporation which owned it, a part owner thereof, shall be declared to be a public warehouse. The amendatory act under consideration tends to convert it into a private or individual warehouse, to be operated for the private advantage and benefit of the owners or manager, and to the practical exclusion of producers and shippers, whenever that course may be found to increase the gains and profits of the manager and owners of the warehouse. The manifest constitutional intent is that the owners and managers of public warehouses shall constitute and act as trustees for others who may desire to store grain with them, and that such warehouses shall be in fact, as well as in name, public—not private—warehouses. The constitutional intent was that the managers and owners of such public agencies as public warehouses should not be permitted to pursue such a course in the management of the public agency under their control as would expose them to the temptation to act contrary to their public duty and bring their interest in conflict with the faithful discharge of such duty, and thus prejudice the rights and interests of that class designed to be protected by the provisions of the constitution, namely, the producers and shippers of grain. The amendatory act declares that such managers and owners or lessees may, in the discharge of the duty they owe to the public, pursue a course that will bring their interest in conflict with

such public duty, and thereby put their integrity to the test of the temptation to make gain by a betrayal of duty and expose them to the temptation to disregard that duty, and as a substitute for the protection intended by the constitution for the protection of the producers and shippers, namely, that the business of a public warehouseman should be so conducted that it would not be to the interest of the manager, lessee or owner thereof to wrong the owners of grain stored in his warehouse, the amendatory act substitutes the policy of charging it as a duty upon the inspector of grain to see that the managers, owners or lessees of such warehouse are not overcome by the temptations, arising out of their own interest, to pursue a course that would injure the producer and shippers. The constitutional remedy of protection is that the warehouseman shall act only as a trustee for others, and the producers and shippers shall not be subjected to the danger of loss through the pressure of personal interest of the trustee to wrong them. The remedy for their protection offered by the amendatory act is, that the warehouseman shall be allowed to enter upon a course of dealing that will place his interest in opposition to his duty, and the producers and shippers shall rely upon the vigilance of grain inspectors to detect and prevent any wrong that may grow out of the failure of the warehouseman to resist the temptations that the amendatory act has, in effect, placed before him. But the question is not whether the substituted measure of protection will prove as effectual as that intended by the framers of the constitution. That which is enjoined by a fair implication from the constitutional provisions should be obeyed by the law-making department of the State. The attempted substitution by the legislature of something as the equivalent of that which is enjoined by the constitution is the assumption by the law-making body of that supreme power which rests in the people.

The argument that the restriction declared by this court in *Central Elevator Co.* v. *People, supra,* upon the power of a public warehouseman in the matter of buying and storing his own grain in his own warehouse is based upon the then existing public policy of the State, and that the amendatory act of 1897 should be regarded as operating, as it is urged it lawfully might, to change such public policy, cannot be accepted. Even if it is the correct view the restriction is based alone upon grounds of public policy, the public policy so prevailing has its basis in and exists by virtue of the limitations and guaranties of the constitution. Public policy may be indicated by the constitution of this State. (*People* v. *Chicago Gas Trust Co.* 130 Ill. 268.) The right to change such public policy cannot, therefore, be exercised by the General Assembly, but only by that higher power which alone may make and unmake constitutions.

If the constitution did no more than to make it incumbent upon the legislature to pass laws for the protection of producers and shippers against the wrongs and imposition upon the part of those engaged in the business of receiving grain for storage, the question whether the mode or manner adopted by the legislature in an enactment adopted for that purpose will accomplish the purpose, or whether another mode or manner is not better than the one selected, would be for the determination of the legislature, and with which the judiciary would not assume to interfere. The wisdom and discretion of the legislature would in such event be involved, and the remedy, if their action proved ineffectual, would be by appeal to a succeeding legislature for the repeal of the ineffective act and the enactment of another that would provide the needed measure of protection. The amendatory act purports to take away from the producers and shippers that mode and means of protection which the framers of the constitution intended should be provided and preserved for them, and for that reason the enactment

must be condemned as unconstitutional,—not because it might appear to the court a more effective manner of protection might have been adopted.

The argument of counsel for the appellant that the views we have expressed operate to deprive warehouse-men of a property right, in violation of the guaranties of the Federal constitution, is best presented in the language of counsel. We quote from their brief, as follows: "The warehousemen, it would seem, have the right to use, for storage purposes, all space in their warehouses not required by the public demands, because the warehouses are theirs,—the right of property in them is their right of property,—and by devoting the warehouses to the business of storing for the public for hire, they have surrendered the use to the public only to the extent of the desire and ability of the public to accept such use. If the act of the warehousemen in resuming the occupancy of the warehousing space not demanded by the public can, as must be presumed, be exercised without infringing upon the public right of use and without detriment to the public weal, then any provisions of the State constitution which, if valid, would prohibit the use by the warehousemen of such otherwise waste space must be held to deprive the warehousemen of their liberty to contract, and of their property, without due process of law, and to be void under the fourteenth amendment to the constitution of the United States."

No question is presented by this record as to the right of a public warehouseman to store his own grain in vacant places in his own warehouse where the space so vacant was not occupied and not needed for the storage of grain of customers of the warehouse. That which the warehouseman here seeks to do and which the court has prohibited from being done is the mixing of the grain of the keeper of a public warehouse with that of his customers, and issuing and dealing in certificates or warehouse receipts representing a mass of grain composed of

198—7

that of the keeper of the warehouse and of his custom-
ers.   No question of an infringement of a right secured
by the constitution of the United States is involved in
that controversy.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*

Wilkin and Carter, JJ., dissenting.