## Adolph J. Lichtstern, Appellee, v. J. Rosenbaum Grain Company et al., Appellants.

### Gen. No. 18,796.

1. INJUNCTIONS—*interlocutory order not appealable, when.* Where it is ordered that a temporary injunction issue against defendants upon complainant's filing a specified bond, and the time within which to file the bond is not fixed, and on appeal the record does not show that any bond was filed or injunction issued, such an order is erroneous in not limiting the time for filing bond, and considered in connection with Practice Act, § 123, is not appealable.

2. INJUNCTIONS—*when order has no restraining influence.* An order that a temporary injunction issue against defendants upon complainant's filing a specified bond, the time within which to file the bond not being fixed, has no force or effect as an injunction until the prescribed condition is performed.

3. WAREHOUSEMEN—*duties.* The owners of a warehouse are public trustees charged with a duty to the public which does not permit them to own, directly or indirectly, any of the grain stored in their own warehouses.

4. INJUNCTIONS — *when complaint must show special injury.* Where the holder of warehouse receipts seeks to enjoin defendants, owners of the warehouse, from storing any of their own grain in it, or from cleaning grain and mixing it for the purpose of storing it in such warehouse, he must show actual damage or special injury to his rights beyond the fact that defendants are indulging in a general practice affecting all holders of warehouse receipts in the same manner, which is contrary to their duty as public trustees.

Appeal from the Circuit Court of Cook county; the HON. FREDERICK A. SMITH, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1912. Reversed. Opinion filed January 9, 1913.

Statement by the Court.   This is an appeal from an interlocutory injunctional order, entered upon the motion of complainant (appellee) for a preliminary injunction, based upon the verified bill of complaint, treated as an affidavit, and upon oral evidence heard by the court, the hearing of which consumed nearly two weeks' time, and is contained in a record of nearly two thousand pages.

The bill alleges that the defendants (appellants) are engaged in the business of conducting grain elevators in Chicago, some of which are public warehouses and some are private warehouses and grain cleaning houses; that they are also engaged in buying and selling grain in Chicago and elsewhere; that the public warehouses are conducted under the name of Joseph Rosenbaum, while the grain business is conducted under the name of J. Rosenbaum Grain Company, an Illinois corporation, the stock of which is all owned by said Joseph Rosenbaum and his sons and relatives; that they are all interested in the public warehouse business "to the same proportionate extent as they are stockholders" in the Grain Company; that the public warehouse business and the private grain business are all one business, and that the sole reason which defendants have for conducting it under two names is to enable them to "unlawfully and without detection store their own grain in their own public elevators and there mix it with the grain of their depositors;" that defendants are conducting in this manner six public grain elevators, having an aggregate capacity of 6,500,000 bushels; that complainant is a member of the Chicago Board of Trade, and is engaged in buying grain "in the pits for future delivery," and carrying the same with a view of subsequently selling it at a profit; and that he is the owner of warehouse re-

ceipts issued by J. Rosenbaum, covering over 500,000 bushels of wheat stored in defendants' elevators. It is further alleged that for the purpose of evading the decisions of the supreme court holding that the operators of "Class A" public warehouses are public trustees and cannot, therefore, have any interest, other than as warehousemen, in grain stored in their own public warehouses, defendants have resorted to the following device or subterfuge, to-wit: Whenever the Grain Company buys any grain in the country or in the cars, it makes a sale of the same quantity for future delivery on the Board of Trade, and uses this sale as a "hedge" until the grain so purchased by it shall arrive; if upon arrival the grain thus purchased is not of the required contract grade, it is made into contract grade, and made available for delivery upon said "hedge" sale; that when ready to go to store the Grain Company makes a pretended sale thereof to one of certain selected brokers at an arbitrary price, with the understanding that the grain thus sold shall at once go to store in one of defendant's warehouses, which being done, the warehouse receipts therefor are issued to such broker, who, immediately and as a part of the same transaction, makes an agreement with the Grain Company to sell and deliver to it the same quantity of the same grade of grain at a certain future time at a price one-quarter or one-eighth of a cent per bushel higher, plus the carrying charges, it being understood, also, that the same warehouse receipts shall then be delivered to the Grain Company by the broker; that by this artifice defendants, while apparently having no interest in the grain thus stored, are in fact the real owners of large quantities of grain stored in their own elevators, and that they threaten to continue this practice and in this manner to continue to mix their own grain with that represented by complainant's warehouse receipts. It is further averred that one of defendants' elevators, known as "Irondale A," consists of eighty-four steel tanks,

numbered consecutively 1 to 84 inclusive, so connected with each other by chutes, conveyors and other means of transferring grain from one tank to another as to form one warehouse; that defendants own and operate a structure adjacent to said "Irondale A," so built as to enable them to dry and clean grain of inferior grade and mix it with grain of better quality, and that the latter building is so connected by tunnels, conveyors and belts with said eighty-four steel tanks that grain may be transferred from one to the other at will; that on May 26, 1911, defendants secured from the Railroad and Warehouse Commission a license to operate tanks numbered 43 to 84 inclusive in said "Irondale A" elevator as a public warehouse of "Class A," and that they have been using the same as such, while at the same time they have been using tanks numbered 1 to 42 inclusive of the same structure as a house for drying and cleaning and mixing grain "with a view to raising the quality of the united mass sufficiently to pass inspection as one of the standard grades, contrary to the statute;" that the J. Rosenbaum Grain Company is constantly transferring grain which has been cleaned by it into said public warehouse, whereby the quality of the grain covered by complainant's warehouse receipts is constantly being depreciated; that this conduct is a violation of its duty as trustee for the complainant and others who own warehouse receipts for grain in defendants' warehouses; that by these means, defendants are in a position to receive into their public elevators wheat which "is near the bottom of the grade and just sufficient in quality to pass for a particular grade," and when complainant shall call for the grain covered by his warehouse receipts, to deliver to him grain of the lowest quality of the specified grade and retain for their own use the grain of better quality to meet the receipts issued to their own brokers, and hence, are in a position where their personal interests may induce them to discriminate against the complainant.

The bill prays that defendants may be enjoined: (1) from storing in their public "Class A" elevators any of their own grain, and from resorting to any device or subterfuge to accomplish that result; (2) from "concurrently making" any contract of sale for immediate delivery of any grain of the Grain Company to go to store in one of defendants' public warehouses, and a contract of sale with the purchaser, for future delivery, of grain of the same quantity and quality at a difference in price equal to a fraction of a cent a bushel, in addition to carrying charges; and from making such contracts when it is understood that the same warehouse receipts shall be used in both transactions; (3) from using any of the tanks in the Irondale elevator for drying and cleaning or improving the condition or value of any grain stored therein, except upon the request of depositors (other than defendants) whose grain is stored in a private bin thereof; (4) from exacting from complainant any charges for the storage of any grain covered by his warehouse receipts; (5) from permitting any of defendants' public warehouses to become irregular under the rules of the Board of Trade; (6) from receiving into their public warehouses any grain coming from any cleaning house owned or operated by them.

Complainant's oral evidence tends *prima facie,* to establish the essential allegations of the bill of complaint, except those relating to the alleged actual present connection between the different parts of the Irondale elevator, and except that there was no oral proof of any actual discrimination in the storing of grain, and appellee's counsel stated upon the hearing that in his view of the case, such proof of actual discrimination was unnecessary. The main facts regarding the customary business methods and practices of the defendants, as alleged in the bill, were not disputed, except as above stated, but the defendants denied that they ever in fact owned any grain in their own public warehouses, and denied that there was anything illegal

or contrary to law in their business methods, and claimed that their concurrent sales and purchases are bona fide transactions, such as are in common use on the Board of Trade as a protection against fluctuations in the market price of grain. They sought also to prove that the object of complainant in seeking an injunction was to assist him in "cornering" the wheat market but the chancellor ruled that such evidence was inadmissible.

Upon the evidence thus heard, complainants moved the court to grant a preliminary injunction as prayed for in the first, third and sixth paragraphs of the prayer of the bill. The chancellor denied the motion as to the third paragraph, but allowed the motion as to the first and sixth paragraphs, and it was thereupon ordered that upon complainant's filing a bond in the sum of $100,000, with surety to be approved by the clerk of the court, a temporary injunction issue against the defendants and their agents and servants, restraining them until the further order of the court, from directly or indirectly, or by "any device or subterfuge, including the practice of selling for cash for present delivery and simultaneously buying back for future delivery the same kind of wheat," or by any other means, storing in any of their public elevators any wheat in which they have any interest other than as warehousemen, and from mixing together anywhere any wheat of different grades for the purpose of storing the same in any of their public warehouses. The defendants appeal from this order.

MAYER, MEYER, AUSTRIAN & PLATT, for appellants.

HENRY S. ROBBINS and FRANCIS G. HANCHETT, for appellee.

MR. JUSTICE FITCH delivered the opinion of the court.

While counsel have presented and discussed at length a number of interesting legal questions which

undoubtedly it would be necessary for us to decide if this were an appeal from a final decree, we have reached the conclusion that but two of them are of controlling importance upon this appeal from an interlocutory order. These two questions may be stated as follows: First, is the order appealable; or if appealable, is it erroneous, in view of the fact that it directs an injunction to issue upon the condition that the complainant file a bond of $100,000 without fixing or limiting any time when or within which it must be filed; second, is the right of appellee to maintain this bill sufficiently free from doubt as to justify the issuance of a preliminary injunction in the absence of any affirmative showing of irreparable injury to him?

The order does not, in terms, enjoin or restrain the defendants from doing anything, nor does it, in terms, expressly require the complainant to file the specified bond, nor fix any time within which he may file it. It is, therefore, entirely optional with him when, if ever, the injunction shall "issue." The record does not show that any injunction bond was ever filed, nor any injunction actually "issued." Appellant's counsel state in their brief, and appellee's counsel conceded, on the oral arguments, that in fact no bond has even yet been filed. It is an elementary principle in the law of injunctions, that "the utmost care should be observed in the granting of preliminary injunctions," and that such an injunction "should only be allowed upon a clear necessity being shown of affording immediate protection to some right or interest of the party complaining which would otherwise be seriously injured or impaired." 1 High on Injunctions, sec. 10. By the terms of this order, however, the court in effect delegated to the complainant the power of deciding for himself whether his need was urgent or otherwise, and placed in his hands the right to use or not to use, in his discretion, the "strong arm of the court." Until the complainant shall decide whether he needs an injunction and whether his need is suffi-

ciently urgent to induce him to file a bond for $100,000, no injunction can "issue" under the order of the court. Until then, the order, in itself, has no restraining force or effect, for there is nothing elsewhere in the order which either expressly or by implication, enjoins or restrains the defendants from continuing the practice complained of. They could not be punished for contempt for so doing, for the reason that such an order has no force or effect as an injunction until the prescribed condition is performed. Winslow v. Nayson, 113 Mass. 411; Clarke v. Hoomes' Ex'rs, 2 Hen. & M. (Va.) 23; State v. Irwin, 30 W. Va. 404; 2 High on Injunctions, secs. 1429, 1620, 1621. While it is true that whatever the defendants may do, or may have done, since the court below acquired jurisdiction, has been and will be done at the risk of being compelled to restore the conditions then existing, yet this was true as well before the interlocutory order was entered as since it was entered. Hence the order, in itself, imposed no additional restraint, if it can be called such, in this respect.

Section 123 of the Practice Act, which governs appeals from interlocutory orders, requires an appeal to be "taken" within thirty days from the "entry" of the order, and to be "perfected" in this court within sixty days, whereupon the hearing of such an appeal takes precedence of all other causes in this court. The statute further provides that "the force and effect of such interlocutory order * * * shall not be stayed during the pendency of such appeal." While it would seem clear from the language of this section of the statute, that the right of appeal would be lost if not exercised within the statutory thirty days from the date when the order is entered by the lower court, whether such order is in force during such thirty days or not, yet it by no means follows that the lower court may properly enter an order purporting to grant an injunction, in such form as to have no restraining force or effect "during the pendency of such appeal."

The contrary would seem to be clearly implied from the provision above quoted to the effect that the appeal shall not operate to stay the force and effect of the order appealed from. Evidently the legislature assumed, when it enacted this provision of the statute, that no order would be entered granting an interlocutory injunction, until after it has been made to appear that the necessity for such action is urgent, and that such order, when entered, would be immediately effective, or at least, would be made effective within thirty days. If, however, an order is entered which does not expressly enjoin the doing of the acts complained of, but merely provides that a temporary injunction may issue at any time thereafter that the complainant shall see fit to file a bond of a specified amount, or shall see fit to perform some other specified condition, the fact that the order is so entered is, of itself, strong evidence that no such urgency exists as to warrant the issuance of a writ of injunction *pendente lite*. In our opinion, the order is erroneous in not fixing a short time, not exceeding thirty days, within which the specified condition must be performed, so that if the condition be performed, the interlocutory injunction order will be in force and effect when an appeal is taken therefrom, and this court will have before it for decision a live question; or, on the other hand, if the condition be not performed within the time limited by the order, then there will be no occasion for an appeal. We think the language above quoted from the Practice Act is entirely inconsistent with the theory that the legislature intended to require this court to hear and determine questions regarding the validity and propriety of interlocutory injunctional orders which are not in force at the time they are brought before us for review, especially in view of the provision requiring us to give such appeals precedence over all other causes.

As to the second question above stated, counsel for appellee took the position, both in the court below and

in this court, that it was unnecessary for the complainant to either allege or prove any actual damage or injury to complainant's rights beyond the mere fact that defendants are indulging in a practice which is contrary to their duty as trustees for the holders of warehouse receipts. It will be noted that the order as entered does not purport to authorize the issuance of any injunction restraining defendants from doing anything to the prejudice of the complainant alone, but from indulging in the practice of storing any of their own wheat in their own warehouses and of cleaning wheat anywhere for such purpose. The argument was and is, that an equitable *principle,* viz.: a trust, is involved; that while defendants are public trustees and charged with a duty towards the public which will not permit them to own, directly or indirectly, any of the grain stored in their own warehouses, or to mix grain for the purpose of sending it to store in such warehouses, as was held in Central Elevator Co. v. People, 174 Ill. 203, and Hannah v. People, 198 Ill. 77, yet there is a special trust in favor of the holders of their warehouse receipts; and that on this principle, the complainant as one of the *cestuis que trust,* may maintain a bill to enjoin any violation of duty by defendants as such trustees. To this argument, appellants' counsel reply that for any violation of the defendants' duty as public trustees, the public, only, can complain, through its authorized representative, the attorney-general; that no private individual can maintain an action based upon any alleged breach of a public duty unless he avers and proves some special injury, different in kind, and not merely in degree, from that of the public generally.

Without undertaking to analyze the numerous authorities cited by counsel in support of their respective contentions, it will suffice to say that from our examination of these, and other authorities, it is apparent to us that the right of the complainant to bring this suit, in the absence of any showing of special in-

jury and particularly his right, as an individual receipt holder, to an injunction which restrains the defendants from continuing an alleged *general practice* affecting all present and future holders of warehouse receipts in precisely the same manner that it affects him, is so very doubtful that no preliminary injunction should have been issued. The right to a preliminary injunction under similar circumstances was denied in Weed v. Roberts, 49 N. Y. Supp. 366; Fritz v. Erie City Pass. Ry., 155 Pa. St. 472; Ryan v. Williams, 100 Fed. 177.

For the reasons indicated, the order of the circuit court will be reversed.

*Order reversed.*