# In re FARMERS COOPERATIVE ASSOCIATION

## (8 N. W.2d 557.)

(File No. 8533. Opinion filed March 18, 1943.)

Rehearing Denied May 22, 1943.

**Leo A. Temmey,** Atty. Gen., and **William Williamson,** Asst. Atty. Gen., for Appellant Public Utilities Commission.

**Edward Prchal,** of Burke, for Respondent.

SMITH, J. The question presented by this appeal is whether the power of Congress to regulate interstate commerce embraces the exhibited grain storage operations of the Farmers Cooperative Association, a corporation of Dallas, South Dakota. The State of South Dakota, acting through the Public Utilities Commission, questions the federal power and asserts its powers of regulation under the statutes of the state.

By the United States Warehouse Act, 7 U.S.C.A. § 241 et seq., Congress has authorized the Secretary of Agriculture, upon application, to issue to any warehouseman a license for the conduct of a warehouse, or warehouses, § 244. It defines the term "warehouse" as "every building * * * in which any agricultural product is or may be stored for interstate or foreign commerce * * *", § 242. As a con-

dition to the granting of such a license the warehouseman is required to execute and file with the Secretary of Agriculture a bond to the United States to secure the faithful performance of his obligations as a warehouseman. The Secretary may in his discretion require fire and other insurance. § 247. Only a warehouse so licensed may be designated as bonded under the Act. § 250. Persons may be licensed to inspect, sample, or classify agricultural products stored in such a warehouse, § 252, and any such products so stored shall be inspected and graded by a person so licensed, § 256. The Secretary is authorized to establish and promulgate standards for agricultural products. § 257. The mingling of fungible agricultural products is permitted under certain conditions. § 258. Receipts, the contents of which are provided by § 260, must be issued for such products actually stored at the time of issuance thereof. § 259. While such a receipt is outstanding, no further receipt shall be issued, except in case of the loss or destruction of the same. § 261. Provision is made for the keeping of records, and making of reports to the Secretary, § 264, examination of the stored products by the Secretary, § 265, publication of reports of such investigations, and for the making of rules and regulations by the Secretary. Section 269 reads in part as follows: "In the discretion of the Secretary of Agriculture he is authorized to cooperate with State officials charged with the enforcement of State laws relating to warehouses, warehousemen, weighers, graders, inspectors, samplers, or classifiers; but the power, jurisdiction, and authority conferred upon the Secretary of Agriculture under this chapter shall be exclusive with respect to all persons securing a license hereunder so long as said license remains in effect."

The South Dakota Public Warehouse statutes, SDC 60.03, are equally comprehensive. They provide for a license from the Public Utilities Commission, and declare "It shall be unlawful for the owner, lessee, or manager of any public warehouse * * * to transact any business * * * until a license has been procured * * *." SDC 60.0304.

Before a license is granted to operate a public grain warehouse, a bond must be filed with the Commission, and in case the value of the property held in storage exceeds the amount of the bond on file, an additional bond must be filed. SDC 60.0305. Monthly reports and called reports must be made to the Commission. SDC 60.0310. The Commission is required to fix reasonable handling, redelivery, and storage rates. SDC 60.0311. The contents of the receipt are provided by statute but the Commission prescribes the form thereof. No more than one receipt may be issued for the same lot of grain. SDC 60.0316. The Commission is authorized to inspect the warehouse, and its records and to investigate its business and methods. SDC 60.0322, 60.0323.

Prior to 1935 the Cooperative was licensed under the state act. During that year it made application for and was granted a license under the federal act, and has since failed and refused to comply with the state act. After investigation, upon notice and hearing, the Commission found that "the Farmers Cooperative Association, a corporation at Dallas, South Dakota, and its officers and directors, are not now and never have been engaged in the storage of grain for or in the course of interstate and foreign commerce, and said corporation, its officers and directors, are operating in violation of state law in that it and they have not procured a license from the Public Utilities Commission of this state to operate as grain warehousemen, * * *" and entered its order requiring such corporation, its officers, directors and employees to cease and desist from further operations as grain storage warehousemen. On appeal to the circuit court, the order was reversed, and the Commission has brought the record here for review.

The facts are not in dispute. During the period investigated, viz., July 26, 1939 to April 20, 1940, the corporation received in storage only 62,256 bushels of wheat under 242 storage receipts or contracts. Of this volume 205 bushels were redelivered to owners, 8,000 bushels remained in storage, and the balance had been purchased by the Coopera-

tive, the receipts cancelled. The grain so purchased by the Cooperative was thereafter shipped out of the state to terminal markets in other states. All of this wheat delivered for storage was produced within the state and was receipted for by federal receipts reading in part as follows:

"Received from _____ of _____ pounds of grain of the amount, kind and grade described herein, for storage in course of interstate or foreign commerce in the above-named warehouse for which this receipt is issued subject to the United States Warehouse Act, the regulations for grain warehouses thereunder, and the terms of this contract.

"Said grain is fully insured by the undersigned warehouseman against loss or damage by fire, lightning, and tornado, unless expressly stated otherwise on the face of this receipt. Said grain is accepted for storage upon condition that the holder of the receipt or depositor of grain shall demand the delivery of the grain not later than one year from the date of this receipt. The undersigned warehouseman is not the owner of the grain covered by this receipt, either solely, jointly, or in common with others, unless otherwise stated hereon. Upon the return of this receipt, properly endorsed, and the payment of all charges and liabilities due the undersigned warehouseman, as stated herein, said grain or grain of same or better grade will be delivered to the above-named depositor or his order."

As wheat was stored the intention of the owner was not discussed. Occasionally when questions were asked the Cooperative explained that they were licensed under the United States Warehouse Act. Subsequent to January, 1940, the Cooperative posted a notice in its place of business reading in part as follows: "only grain in the course of interstate and foreign commerce will be accepted for storage here."

The central issue is two-fold. Does warehousing as conducted by the Cooperative fall within the reach of the power granted to Congress by the commerce clause of the Constitution? Article I, § 8, clause 3. If so, did Congress

intend to exert that power when it enacted the United States Warehouse Act?

 The broad controlling principles upon which our decision must rest have been settled by the Supreme Court of the United States. The power of Congress to regulate commerce with foreign nations and among the several states "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L. Ed. 23. "The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." United States v. Darby, 312 U. S. 100, 61 S. Ct. 451, 459, 85 L. Ed. 609, 132 A. L. R. 1430. "Whether the subject of the regulation in question was 'production,' 'consumption,' or 'marketing' is, * * * not material for purposes of deciding the question of federal power * * *. That an activity is of local character may help in a doubtful case to determine whether Congress intended to reach it. The same consideration might help in determining whether in the absence of Congressional action it would be permissible for the state to exert its power on the subject matter, even though in so doing it to some degree affected interstate commerce. But even if * * * activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect'." Wickard et al., v. Filburn, 317 U. S. 111, 63 S. Ct. 82, 89, 87 L. Ed. 122. The power to regulate interstate commerce includes the power to foster, protect and stimulate commerce. United States v. Lowden, 308 U. S. 225, 60 S. Ct. 248, 84 L. Ed. 208; Wickard et al. v. Filburn, supra. It is of the essence of this power

of Congress that where it exists it dominates. Houston, E. & W. T. R. Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341. There is no room in our scheme of government for the assertion of state power in hostility to the authorized exercise of Federal power. The Minnesota Rate Cases, (Simpson v. Shepard) 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A., N. S., 1151, Ann. Cas. 1916A, 18. Wherever conflict exists, the state legislation must fall. Gibbons v. Ogden, supra; Kelly v. Washington, 302 U. S. 1, 58 S. Ct. 87, 82 L. Ed. 3.

The Cooperative asserts alternatively that its operations are a part of interstate commerce, or they so affect that commerce as to fall within the reach of the federal power.

That such warehousing by country elevators is a part of interstate commerce has never been declared by the Supreme Court of the United States. To the contrary, it said in Munn v. Illinois, 94 U. S. 113, 135, 24 L. Ed. 77, in upholding state regulation of terminal elevators, "The warehouses of these plaintiffs in error are situated and their business carried on exclusively within the limits of the State of Illinois. They are used as instruments by those engaged in State as well as those engaged in interstate commerce, but they are no more necessarily a part of commerce itself than the dray or the cart by which, but for them, grain would be transferred from one railroad station to another. Incidentally they may become connected with interstate commerce, but not necessarily so. Their regulation is a thing of domestic concern, and certainly, until Congress acts in reference to their inter-state relations, the State may exercise all the powers of government over them, even though in so doing it may indirectly operate upon commerce outside its immediate jurisdiction." And explained that holding in its later opinion in Shafer v. Farmers Grain Co., 268 U. S. 189, 45 S. Ct. 481, 486, 69 L. Ed. 909, by saying, "The court held such a regulation admissible * * * because interstate commerce was affected only incidentally and remotely." We perceive no difference which distinguishes these storage transactions of grain produced for

interstate commerce from numerous other local activities looking toward such commerce, such as "production" and "manufacturing," to which that court has applied the so-called "mechanical test" and held to be intrastate in character. See Parker et al. v. Brown, 317 U. S. 341, 63 S. Ct. 307, 87 L. Ed. 315, and cases cited. We do not look upon Lemke v. Farmers Grain Co., 258 U. S. 50, 42 S. Ct. 244, 66 L. Ed. 458, or Shafer v. Farmers Grain Co., supra, as authority for a different view. Those cases dealt with the reach of the reserved powers of the states, and struck down a state enactment which regulated "buying for interstate shipment" which was held to be a component of such commerce.

■ We hold that the warehouse business of the Cooperative is local in character and not a part of interstate commerce.

Thus we are brought to the pivotal question. Does the warehousing business of the Cooperative so affect interstate commerce as to fall within the reach of federal power? The authoritative declarations of the Supreme Court of the United States indicate that an affirmative answer must be made if it appears, from a study of the course of national commerce in wheat, that the aggregate business of all like local elevators exercises a substantial economic influence or effect on interstate commerce.

■ It was on such an economic basis that the Supreme Court lately justified federal regulation of the domestic consumption by an Ohio farmer of wheat raised on his small farm and never intended in any part for interstate commerce. In writing of the relation of his meager consumption to the national demand and supply, it said "That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." Wickard et al. v. Filburn, supra. Our conclusion that we must look to the impact on the national economy of the country elevator business as a whole in determining whether its effect on interstate com-

merce is substantial in degree is predicated on that holding. In fact, if its length did not forbid, we would reproduce the second part of that opinion because it reveals the court's authoritative interpretation of the whole course of its decisions expounding the commerce clause and places a new and strengthened emphasis upon the "embracing and penetrating nature" of the power of Congress thereunder, not merely to "prescribe the rule by which interstate commerce is governed" but to take control of all intrastate activities capable of producing harmful or beneficial national economic repercussions. The fact that there are many who respectfully question the rationale of this interpretation is inapposite to our analysis of the issue before us. It is our function to apply the law as it has been authoritatively declared.

 We know judicially that which is a matter of common knowledge, viz., that the fixed course of the business which supplies the nation's bread includes the storage of wheat in country elevators along the net work of our railroad lines, there to be safeguarded and protected while owners await a favorable market. These depots of supply are only secondary in importance in the national wheat economy to the great terminal warehouses. At times a major fraction of our available supply of wheat is housed within these rural structures, and at any given moment they contain a large bushelage of that product. With what reason can it be said that a power to regulate interstate commerce, which encompasses the adjustment of the domestic consumption of an individual farmer to the national supply, fails to embrace the safeguarding and protecting so large a share of the nation's stock of that food? To offer owners and producers a place in which they may store their wheat at regulated reasonable rates and know that the building in which it is kept and the manner in which it is graded and handled are subject to public inspection and control, and that its redelivery is assured by bond and insurance, is but a method of encouraging its placement where it will be convenient to and safeguarded for the interstate market.

It is only necessary to visualize ramshackle housing, non-uniform and dishonest grading, losses from defalcation, and unskilled handling at these points, with a resultant disposition on the part of the producer to retain grain on the farm until cars are made available in which it could be transported to terminals, to conclude that this business affects our commerce in wheat. Without its present high standards of service much of our national supply would be damaged or destroyed and the flow to the nation's markets would be impeded. Predicated upon the economic test of the Supreme Court of the United States, we think the conclusion inescapable that the country elevator exercises an important and substantial effect on interstate commerce, and therefore falls within the embrace of the power of Congress.

Reason impels the conclusion that the Congress intended to authorize the Secretary of Agriculture to regulate warehouse businesses of the kind described. The aim of the enactment was to secure fair and uniform business practices, Federal Compress & W. Co. v. McLean, 291 U. S. 17, 54 S. Ct. 267, 78 L. Ed.. 622, and to facilitate and safeguard the commerce in agricultural products. The dominant words employed are "stored for interstate * * * commerce". United States v. Hastings, 296 U. S. 188, 56 S. Ct. 218, 221, 80 L. Ed. 148. In common usage the preposition "for" indicates that "in consideration of which, in view of which, or with reference to which anything is done." Webster's New International Dictionary. By the use of that word, rather than the phrase "in the course of", Congress has supplied a clear and unmistakable indication of an intention to encompass more than that which forms a part of interstate commerce. It logically follows that it must have intended to include storage which affects interstate commerce. That the Supreme Court of the United States is of this view seems to be implicitly revealed by its opinion in Federal Compress & W. Co. v. McLean, supra, which dealt with warehousing of cotton within the state of its origin but intended for interstate commerce. That the

Congress did not intend the Act to apply to warehouses "operating under state laws and serving local demands in intrastate transactions; receiving for storage and issuing receipts for agricultural products in connection with enterprises and trade that are entirely local", is indicated by United States v. Hastings, supra. But here all but a negligible part of the grain stored during the period investigated moved in interstate commerce and we judicially know that the great bulk of our wheat is intended for that commerce when produced. As we have indicated, according to the course of business, wheat is amassed at these depots of supply for the very purpose of feeding the stream of commerce. There grain is in fact stored "for interstate commerce" and we hold such plants to fall within the purview of the act.

██ ██ The validity of the act, because of its permissive character, is faintly raised. The suggestion is untenable. The act conforms to the principles which govern the delegation of duties to an administrative officer, and there is no rule of uniformity in connection with the commerce power. Congress can determine to what extent it will exert its power. Currin v. Wallace, 306 U. S. 1, 59 S. Ct. 379, 83 L. Ed. 441.

██ It is suggested that "The principle is thoroughly established that the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together'" (see Kelly v. Washington and cases cited, 302 U. S. 1, 58 S. Ct. 87, 92, 82 L. Ed. 3) is applicable here. We think not. The collision between these acts is head on. It is but a question of which master the Cooperative must serve. As the federal act was originally framed it said, "Nothing in this chapter shall be construed to conflict with, or to authorize any conflict with, or in any way to impair or limit the effect or operation of the laws of any State relating to warehouses, * * *." But in 1931 it was amended and now reads, "In the discretion of the Secretary of Agriculture he is authorized to cooperate with

State officials charged with the enforcement of State laws relating to warehouses, * * *; but the power, jurisdiction, and authority conferred upon the Secretary of Agriculture under this chapter shall be exclusive with respect to all persons securing a license hereunder so long as said license remains in effect." 7 U.S.C.A. § 269. We interpret this as a clear grant of discretionary power to the Secretary of Agriculture, to achieve the congressional aim either through cooperation with state officials in promoting state regulation, or by direct federal control. When the latter course is followed both by reason of the terms of the act, and the paramount nature of federal power, the federal control displaces state control.

We are not unmindful of the fact that the state has been at great pains and expense to build up an efficient system of elevator regulation, and that much of the credit for the high standard of service available at these public grain warehouses is due to the state and its administrative officers. We do not fail to see that a continuing practice of licensing on the part of the Secretary of Agriculture rather than a program of cooperation with the Public Utilities Commission may utterly destroy that which the state has labored so hard to build. However, these are considerations which we are not permitted to weigh in the balance. They bear on the wisdom of exercising the power, not on its existence. They address themselves to the Secretary of Agriculture, in the first instance, then to Congress, and in final anlysis to the sovereign electorate. As Chief Justice Marshall said in Gibbons v. Ogden, supra, "The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at election, are, in this, as in many other instances, * * * the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments."

Finding no error in the record, the judgment of the learned trial court is affirmed.

All the Judges concur.