## BOARD OF TRADE OF CITY OF CHICAGO v. ILLINOIS COMMERCE COMMISSION et al.

## GREAT LAKES ELEVATOR CORPORATION et al. v. SAME.

### Nos. 8897, 8898.

Circuit Court of Appeals, Seventh Circuit.
June 7, 1946.

Writ of Certiorari Granted Oct. 21, 1946.
See 67 S.Ct. 114.

Weymouth Kirkland, Howard Ellis, and William H. Symmes, all of Chicago, Ill., for appellant Board of Trade.

Floyd E. Thompson, Frederick Mayer, A. L. Rittenberg, C. M. Meyer, Leo F. Tierney, Louis A. Kohn, Ferre C. Watkins, and Charles Meyers, all of Chicago, Ill., for appellants Great Lakes Elevator Corporation et al.

George F. Barrett, William C. Wines, Irvin Rooks, and Lee A. Freeman, all of Chicago, Ill. (Albert J. Meserow, Asst. Atty. Gen., of counsel), for appellees.

Before MAJOR and KERNER, Circuit Judges, and BRIGGLE, District Judge.

MAJOR, Circuit Judge.

These are separate appeals from an order of the District Court, entered June 26, 1945, denying plaintiffs an injunction and sustaining defendants' motion to strike plaintiffs' complaint, and dismissing their causes of action. The appellant in No. 8897 is the Board of Trade of the City of Chicago, and the appellants in No. 8898 are operators of

warehouses for the storage of grain located in Chicago, Illinois. The latter have been licensed by the Secretary of Agriculture of the United States (hereinafter referred to as the Secretary), pursuant to the United States Warehouse Act, 7 U.S.CA. § 241 et seq., hereinafter referred to as the Warehouse Act. The appellees in both appeals are the Illinois Commerce Commission, the members of such Commission, Daniel F. Rice & Company and the Attorney General of Illinois. While separate briefs and arguments have been submitted to this court in behalf of the parties in each appeal, the questions for decision are of a kindred nature and we are of the view that both appeals may be appropriately considered and disposed of in the same opinion.

On July 28, 1944, Daniel F. Rice & Company (hereinafter referred to as Rice) caused to be filed before the Illinois Commerce Commission (hereinafter referred to as the Commission) their complaint against the appellants in Nos. 8897 and 8898, alleging violations of the Public Utility Act and the Illinois Grain Warehouse Act of the State of Illinois, Ill.Rev.Stat.1945, c. 111⅔, § 1 et seq.; c. 114, § 293 et seq. Subsequently, there was filed before the Commission separate motions by the Board of Trade and by the warehousemen to dismiss such proceeding on the ground that the Commission was without jurisdiction. On October 10, 1944, the Commission, after consideration of briefs and oral argument, entered its order denying the motions to dismiss the Rice complaint and setting the cause for hearing on October 24, 1944.

Thereupon, the Board of Trade and the warehousemen filed in the District Court separate complaints for the purpose of enjoining the Rice defendants from the further prosecution of their proceeding before the Commission, of enjoining the Commission from entertaining further jurisdiction of said matter and the Attorney General of the State of Illinois from instituting any proceeding against the instant plaintiffs for the purpose of enforcing any order of the Commission in the case now pending before it. Motions to dismiss each of the complaints were interposed. The two causes were consolidated for hearing in the court below, and such motions to dismiss were allowed in a single order. As stated, there are two appeals from this order, one in No. 8897 and the other in No. 8898.

The contested issues in these appeals are predicated upon a similar pattern. While stated by the respective parties in somewhat different phraseology, the essential question for decision on the merits is whether the federal government has by legislation so occupied and pre-empted the field of regulation of the Board of Trade in one appeal and the warehousemen in the other as to deprive the Commission of authority to grant the relief and therefore to regulate in the manner prayed for by Rice. In contending that the federal government has so occupied and pre-empted the field, the Board of Trade (appellant in No. 8897) relies upon the Commodity Exchange Act, 7 U.S.C.A. § 1 et seq., and the warehousemen (appellants in No. 8898) rely upon the Warehouse Act, 7 U.S.C.A. § 241 et seq. While these legislative enactments are separate and distinct, they are as applied to the facts of this case somewhat dependent upon each other, as will be hereinafter disclosed. Another issue raised by the Attorney General of Illinois is that the court below was without jurisdiction to hear and decide the questions presented.

We shall first consider the appeal by the warehousemen (No. 8898). In so doing, it appears desirable to relate further the facts as alleged in the complaint. Jurisdiction was alleged because the controversy arose under the laws of the United States, more particularly under the Warehouse Act, together with the regulations promulgated thereunder, and also by reason of Article 1, Section 8, Clause 3 of the United States Constitution. It was alleged that each of the plaintiffs was engaged in the public storage of grain for hire for interstate commerce under a license duly issued by the Secretary, pursuant to the Warehouse Act, and under a schedule of rates, charges and practices duly filed with the said Secretary, as required by law, and that each of said plaintiffs as a holder of such license was subject to said Warehouse Act and the rules and regulations duly promulgated thereunder. Each of the plaintiffs, except

Great Lakes Elevator Corporation, dealt in grain, both on its own account and as agent for others.

The grain market at Chicago is the world's largest grain market. For the year ending December 31, 1943, approximately two billion bushels of grain were shipped into and out of that market both by rail and water, from and to states other than Illinois. Over 90% of the trade in grain futures contracts in the United States was transacted at the said market on the said Board of Trade, a corporation which has been designated a contract market by the Secretary under the Commodity Exchange Act. Under that Act futures contracts on the Board of Trade and other contract markets may be satisfied by offsetting settlements between the contracting parties, by delivery in kind of the grain involved in the contract, or by the delivery of valid negotiable warehouse receipts of certain characteristics, including receipts issued under the Warehouse Act. The warehouse receipts issued to plaintiffs were issued under, and complied in all respects with the Warehouse Act, and were in general use upon the said Board of Trade in satisfaction of futures contracts on the interstate market, and as such were instruments of interstate commerce.

Then follows a review of the proceedings initiated by Rice before the Commission, plaintiffs' motions to dismiss and the action of the Commission thereon, as heretofore related and which need not be further detailed at this point. It was alleged that each of the plaintiffs, except Great Lakes Elevator Corporation, did business as an owner and merchandiser of grain and regularly stored, for interstate commerce, grain owned by it as well as that of others in its warehouse or warehouses; that this right was permitted by the Warehouse Act and regulations, but that under the Constitution of the State of Illinois as construed by the Illinois Supreme Court it was illegal for a public warehouseman to store his own grain in a public warehouse operated by him. It was alleged that plaintiffs issued to themselves negotiable warehouse receipts for grain, in form prescribed by the Warehouse Act, representing in the aggregate many millions of dollars annually, and that such receipts represent the grain belonging to the owners of such warehouses. Such receipts were used by plaintiffs for the purpose of transferring title to such grain in sales to others and also as collateral for commercial loans obtained from banks. Such receipts were also used by others for a similar purpose. Many of such warehouse receipts were alleged to be outstanding and pledged as collateral for such loans. It was alleged that an application of the Illinois law would make the storing of such grain illegal and would destroy and seriously impair the value of such warehouse receipts in commercial transactions.

It was alleged that a hearing by the Commission on the Rice complaint would have the immediate effect of creating a cloud upon such warehouse receipts outstanding or to be issued and that plaintiffs as well as the public would be subjected as a result to irreparable damages. It was further alleged that plaintiffs were subject to fine and imprisonment for failure to take out a state license under the Illinois law, and that the Commission by its refusal to dismiss the Rice complaint has decided that plaintiffs are subject to the laws of the State of Illinois and the penalties provided for violations thereof.

Each of the plaintiffs filed an affidavit in support of the motion for preliminary injunction, disclosing in detail the national scope of its business. These affidavits show the amount of grain in bushels and value shipped and received by such warehouses from states other than Illinois. (We see no occasion to detail such information inasmuch as no question is here raised but that plaintiffs were engaged in interstate commerce.) The affidavits recite the issuance by each of the plaintiffs of warehouse receipts on forms furnished by the Department of Agriculture, which state on their face that the grain received by each warehouseman was "for storage in the course of interstate or foreign commerce." For the purpose of showing the value of the federal licenses held by plaintiffs, the amount of grain for a designated period stored in each warehouse, including

that owned by the warehouseman against which receipts were outstanding, was disclosed. The affidavits further show that each of the plaintiffs has filed with the Secretary schedules of rates and charges for the storage and handling of grain, and that each is regularly inspected and examined by representatives of the United States Department of Agriculture. It was further disclosed by the affidavits the amount of grain stored by the United States government during a designated period in each of the warehouses operated by plaintiffs. We see no reason to state the amount disclosed as to each warehouse. It is sufficient to state the amount was large; for instance, that stored by the Santa Fe elevator for a twelve month period was 4,663,-469 bushels.

The Attorney General, on behalf of himself and the Commission, raises the question that the lower court was without jurisdiction to entertain the complaint, contending that the suit was one requiring the convocation of a three-judge court, under § 266 of the Judicial Code, 28 U.S.C.A. § 380, that the suit was inhibited by the Johnson Act, § 24(1) of the Judicial Code, 28 U.S.C.A. § 41(1), as amended in 1934, and that interstate commerce was not involved. While Rice made the same contention before the District Court, they have not raised the question here. The position of the Attorney General is predicated upon the erroneous premise, so we think, that plaintiffs by their bill sought to invalidate a state law as being in conflict with the federal Constitution or an enactment of Congress. The case was tried below and is presented here solely on the theory that the state law in question was superseded and rendered inoperative by federal enactment which has "pre-empted" the field in controversy. If the plaintiffs had succeeded below or if they succeed in this court, it would not mean that any provision of the Illinois law or Constitution has been invalidated. It would only mean that such law or constitutional provision is inapplicable to a situation such as the instant one.

§ 266 of the Judicial Code must be complied with only where the injunction is sought "upon the ground of the unconstitutionality of such statute," and § 24(1) of the Judicial Code inhibits a federal court from taking jurisdiction where it is sought to enjoin the action of an administrative board, etc., where jurisdiction is based "solely upon the ground of diversity of citizenship, or the repugnance of such order to the Constitution of the United States." It appears evident that neither of these provisions is controlling. Moreover, in the recent case of Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 786, 62 S.Ct. 491, 86 L.Ed. 754, the complaint alleged, as in the instant case, that the federal statute pre-empted and occupied the field so as to deprive the state agency of jurisdiction. The case was heard by a single judge. The jurisdictional question was raised in the Court of Appeals, 116 F.2d 227, 230, wherein the court stated: "The suit was not one for three judges. It did not attack the constitutionality of the Alabama statutes, it affirmed their constitutionality." The Supreme Court (315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754) decided the case on its merits without reference to the jurisdictional question. See also Ex Parte Bransford, 310 U.S. 354, 358, 60 S.Ct. 947, 84 L.Ed. 1249; Ex parte Buder, 271 U.S. 461, 46 S.Ct. 557, 70 L.Ed. 1036; and Ex Parte Hobbs, 280 U.S. 168, 50 S.Ct. 83, 74 L.Ed. 353. While other points argued by the Attorney General on the jurisdictional phase have been noted, we think they are without merit.

This brings us to a consideration of the case on the merits. No question is raised but that Congress had the authority to exercise all regulatory power over federally licensed warehouses to the exclusion of the state. In fact, such authority on the part of Congress is conceded. The question is, did Congress by the Warehouse Act intend to occupy and pre-empt the field to the exclusion of state authority? That the question is a troublesome one is evidenced by the legion of cases in which it has been considered. A discussion of the numerous cases relied upon by the respective parties for the purpose of distinguishing or reconciling them would perhaps be futile and serve no useful purpose. Reference to a few of the latest Supreme Court opinions will suffice.

In Southern Pacific Co. v. Arizona, 325 U.S. 761, 766, 65 S.Ct. 1515, 1518, 89 L.Ed. 1915, the court stated:

"Congress, in enacting legislation within its constitutional authority over interstate commerce, will not be deemed to have intended to strike down a state statute designed to protect the health and safety of the public unless its purpose to do so is clearly manifested (citing cases), or unless the state law, in terms or in its practical administration, conflicts with the Act of Congress, or plainly and palpably infringes its policy. (Citing cases)."

In Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581, the court stated:

"Our primary function is to determine whether, under the circumstances of this particular case, Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

The case on its facts and questions decided most similar to the instant one is that of Cloverleaf Butter Co. v. Patterson, supra. The court (312 U.S. at page 155, 62 S.Ct. at page 495) enumerates many cases in support of two propositions: (1) "Where this power to legislate exists, it often happens that there is only a partial exercise of that power by the federal government. In such cases the state may legislate freely upon those phases of the commerce which are left unregulated by the nation," and (2) "But where the United States exercises its power of legislation so as to conflict with a regulation of the state, either specifically or by implication, the state legislation becomes inoperative and the federal legislation exclusive in its application."

We think it is fair to conclude that plaintiffs' contention in the instant matter is that this case falls within the second category, while defendants contend that it falls within the first. In other words, defendants appear to concede that there has been a partial invasion of the field by the federal government but that a portion has been left open to the state, and included therein are those matters of which the Commission has assumed jurisdiction as a result of the Rice complaint.

Plaintiffs argue that Congress has specifically taken over all regulatory power concerning federally operated warehouses, or in the alternative, that it has done so by implication, and that exercise by the Commission of the matters before it "plainly and palpably infringes," the policy of Congress or presents an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

The United States Warehouse Act was originally enacted in 1916. As thus enacted, Sec. 29, 7 U.S.C.A. § 269, provided:

"* * * nothing in this Act shall be construed to conflict with, or to authorize any conflict with, or in any way to impair or limit the effect or operation of the laws of any State relating to warehouses, warehousemen * * * but the Secretary of Agriculture is authorized to cooperate with such officials as are charged with the enforcement of such State laws in such States and through such cooperation to secure the enforcement of the provisions of this Act * * *."

In Independent Gin & Warehouse Co. v. Dunwoody, 40 F.2d 1, the Court of Appeals for the Fifth Circuit, relying upon the provision just quoted, affirmed a decree of the District Court which had refused to enjoin the state officials of Alabama from enforcing certain state regulations applicable to warehouses. Shortly thereafter, in 1931, Congress amended § 29 to read as follows:

"In the discretion of the Secretary of Agriculture he is authorized to cooperate with State officials charged with the enforcement of State laws relating to warehouses, warehousemen, weighers, graders, inspectors, samplers, or classifiers; but the power, jurisdiction, and authority conferred upon the Secretary of Agriculture under this chapter shall be exclusive with respect to all persons securing a license hereunder so long as said license remains in effect. * * *"

A literal reading of this amended section furnishes strong support for plaintiffs' contention. Both the House Committee Report (H. Rept. 4, 71st Cong., 1st Sess.,

p. 4) and the Senate Committee Report (S. Rept. 1775, 71st Cong., 3rd Sess., p. 2) furnish further support to the theory that Congress by this amendment intended to eliminate the dual jurisdiction which had theretofore existed between the federal and state governments as to federally operated warehouses. In a footnote we quote some of the more important statements contained in these reports.[1]

The only case of which we are aware wherein a court has considered the precise issue presented here is In Re Farmers Co-operative Ass'n, S.D., 8 N.W.2d 557, 562, decided by the Supreme Court of South Dakota in 1943. The opinion discloses that the licensing feature, in fact the general provisions of the South Dakota law concerning warehouses, are quite similar to those in Illinois. Two questions were before the court: (1) did the warehousemen fall within the reach of the power granted to Congress by the commerce clause of the Constitution? and (2) if so, did Congress intend to exert that power when it enacted the United States Warehouse Act? The first question, not involved in the instant case, was answered in the affirmative, notwithstanding the warehouse in question was local in character and not a part of interstate commerce. This conclusion was reached on the theory that the business of the warehouse affected interstate commerce. In an affirmative answer to the second proposition, the court, in denying the contention that the state and federal Acts were not in conflict, stated: "The collision between these acts is head on. It is but a question of which master the Cooperative must serve." The court then refers to § 29 as amended in 1931, and states:

"We interpret this as a clear grant of discretionary power to the Secretary of Agriculture, to achieve the congressional aim either through co-operation with state officials in promoting state regulation, or by direct federal control. When the latter course is followed both by reason of the terms of the act, and the paramount nature of federal power, the federal control displaces state control."

In connection with this South Dakota decision, see Bacon Grain Co. v. City of Chicago, 325 Ill.App. 245, 253, 59 N.E.2d 689.

At the same time that Congress amended § 29 it also amended § 6, 7 U.S.C.A. § 247, which makes provision for the execution of a bond by warehousemen applying for a federal license. Prior to the amendment the section required a bond "to secure the faithful performance of his obligations as a warehouseman under the laws of the State, District, or Territory in which he is conducting such warehouse, as well as under the terms of this Act * * *." By the 1931 amendment the requirement that the bond be conditioned upon compliance with the laws of the state, district or territory in which the warehouse was conducting business was eliminated and it was only required that the bond be conditioned

[1] In the House Report it was stated: "Under Section 29 * * * of the law as at present, if the Federal Act in any way conflicts with the State law, the Federal law becomes subservient to the State law in so far as there is a conflict. The result is that the Federal law can be negatived by State legislation. * * * To make the law accomplish the real purpose of Congress, it should be independent of any State legislation on the subject."

In the Senate Report it was stated: "Section 29 of the act now provides (quoting from Sec. 29). The effect of this wording is to make the Federal act subservient to State acts wherever there is a conflict. As might be expected there are conflicts between State laws and the Federal act. Since the law specifically makes the Federal act subservient to State laws in case of conflict, this feature militates against the full value of Federal warehouse receipts for collateral purposes. The amendment proposed to this section would make the Federal act independent of State laws. In other words, it would place the Federal act on its own bottom."

The Report referred to the permissive feature of the federal Act and stated: "* * * if it is decided to secure a license under the Federal act then the warehouseman would be authorized to operate without regard to State acts and be solely responsible to the Federal act. * * * In other words, it leaves it with the warehousemen to decide whether they wish to operate under the State or Federal law and having made their choice they shall then be permitted to operate without interference on the part of any agency."

upon compliance with the federal act and federal regulations thereunder. Referring to this amendment, the Senate Committee Report (heretofore noted) stated: " * * * again this amendment to Section 6 naturally follows the amendment suggested to Section 29."

Another legislative expression of some significance is found in the Commodity Exchange Act, § 5a, 7 U.S.C.A. § 7a (7). This section makes it mandatory that receipts issued under the Warehouse Act be accepted in satisfaction of any futures contract without discrimination and "notwithstanding that the warehouseman issuing such receipts is not also licensed as a warehouseman under the laws of any State or enjoys other or different privileges than under State law."

In this connection it is pertinent and of some importance to note that in Cloverleaf Butter Co. v. Patterson, supra, the court (315 U.S. at page 155, 62 S.Ct. at page 491), cites in footnote 5 Merchants Exchange v. Missouri, 248 U.S. 365, 368, 39 S.Ct. 114, 63 L.Ed. 300, as one of the cases holding that the state was free to legislate upon matters left unregulated by the nation. True, the court in the Merchants case referred to § 29 of the Warehouse Act as manifesting the purpose of Congress not to supersede state laws. This reference, however, was made prior to the time § 29 was amended in 1931. More significant is that the court in the Cloverleaf case in footnote 6 (315 U.S. at page 156, 62 S.Ct. at page 491) cites § 29 as an instance where Congress had specifically exercised its power of legislation so as to conflict with the regulation of the state, and that the federal legislation became exclusive in its application. The footnote reference was to § 29, as amended in 1931. Thus we have the court in the same opinion treating § 29 before it was amended as an illustration of dual authority and § 29 after it was amended as providing for sole authority in the federal government.

Defendants profess to discern from the language employed by Congress a purpose and intent to permit the states to share the control over federally licensed warehousemen. It is suggested that the language in § 29, as amended in 1931, by which the Secretary "is authorized to cooperate with State officials * * * relating to * * * warehousemen" recognizes such purpose. We think it more likely that Congress by this language recognized the existence of state laws over all warehouses even though they were instrumentalities of interstate commerce unless and until they had made application and obtained a license under the federal Act. If Congress intended to share with the states the control of the latter class of warehouses, it would seem that there was no real purpose for the amendments of 1931.

Defendants also make the point that the exclusive authority of the Secretary provided in § 29 is confined to that conferred "under this chapter," meaning the federal Warehouse Act. In connection with this point, much stress is placed upon a statement in United States v. Hastings, 296 U.S. 188, 199, 56 S.Ct. 218, 222, 80 L.Ed. 148, wherein the court said with respect to amended § 29:

"The amendment of 1931, with respect to conflict with the operation of state laws, does not militate against this limitation, for while the amendment asserts the exclusive authority of the Secretary of Agriculture, it has relation to the authority conferred by the Act * * *."

The court there had before it the question of the sufficiency of an indictment which charged a theft from a federally licensed warehouse. The indictment was held bad for the reason that there was a failure to allege that the product stolen from the warehouse had been stored for interstate commerce, which the court held was essential to make the Federal act applicable. It was in this connection that the court made the statement just quoted. How this has any bearing upon the instant situation we are unable to discern. Evidently the Act in its relation to warehouses is limited to interstate commerce, and the Secretary's jurisdiction necessarily is confined to that field.

Defendants also stress the point that the obtaining of a license under the Act is permissive. We are unable to see how that affects the situation. It only means that

the warehouseman may exercise an option as to whether he will operate under the state or federal law. When he exercises such option in favor of the latter, complies with its terms and has been issued a license, he is under the Act as definitely and certainly as though it was a mandatory requirement on his part. No vacuum is created, as defendants argue. Before he is issued a federal license he is under the control of the state, but after the federal license has been issued he is under the jurisdiction of the Secretary.

Defendants argue that the federal Act "in nature, form and intent is essentially a warehouse receipt Act" and that the purpose of its enactment was to establish "a warehouse receipt of respected value so that it would be accepted as collateral on loans." Whether the Act should be thus narrowly construed is open to argument, although a study of its provisions together with the legislative history lends support to the contention. Assuming, however, that this theory is correct, we are of the view that it is of little if any benefit to defendants' position. The importance which Congress attached to warehouse receipts is illustrated by the numerous conditions required as a prerequisite to their issuance. See 7 U.S.C.A. § 260. From their very nature it is reasonable to conclude that Congress intended that the federal government take over all authority necessary to preserve their legality, negotiability, safety and value. This in itself required a broad field of control. It must be remembered that these receipts were issued against the grain stored in the warehouse and were conclusive evidence of ownership thereof. Exclusive jurisdiction over the receipts having been conferred upon the Secretary, it seems unreasonable to conclude that he should be required to share with the state jurisdiction over the grain against which the receipts were issued and over the warehouses in which such grain was stored. The efficient handling and preservation of such grain in a warehouse suitable and properly adapted to its storage was highly essential if the Secretary was to discharge properly the responsibility placed upon him in connection with the receipts.

Assuming arguendo that the Secretary was not given express authority over the matters now before the Commission (charged in the Rice complaint), it seems that such authority was clearly implied. This view is strongly supported by the decision in Cloverleaf Butter Co. v. Patterson, supra, where the court sustained the authority of a federal agency to the exclusion of state authority. The product involved was butter. The federal agency was given express authority over the finished product known as renovated butter but not over packing house butter. It was held that express authority over the former carried with it implied authority over the latter. The court on page 169 of 315 U.S. and on page 503 of 62 S.Ct. stated, "Congress hardly intended the intrusion of another authority during the very preparation of a commodity subject to the surveillance and comprehensive specifications of the Department of Agriculture," and that to so construe the federal Act "would not only hamper the administration of the federal act but would be inconsistent with its requirements."

A detailed discussion of the numerous violations charged in the Rice complaint would unduly prolong this opinion. We shall merely attempt to state the various matters complained of and show that the Secretary in the main has explicit authority with reference thereto. In this connection it is pertinent to observe that the Secretary, 7 U.S.C.A. § 268, is authorized to promulgate all rules and regulations regarded by him as necessary for the efficient execution of the Act. In conformity with this provision, the Secretary has promulgated voluminous regulations designed no doubt to cover every feature of the management, control and operation of federally licensed warehouses, the storage of grain therein and the issuance of warehouse receipts. No point is made by defendants but that these regulations are within the authority conferred by Congress upon the Secretary.

Perhaps the most important, at least the most controverted, charge is that the plaintiffs' warehousemen "have unlawfully maintained and do now maintain unjust, unreasonable and excessive rates and

charges for services rendered, contrary to Sec. 32 of the Public Utility Act of Illinois." § 25 of the Warehouse Act provides that the Secretary may, after hearing, revoke a warehouseman's license "upon the ground that unreasonable or exorbitant charges have been made for services rendered." § 23 requires that reports be made to the Secretary concerning the "condition, contents, operation, and business" of the warehouse in such form and at such times as the Secretary may require. The rules and regulations promulgated by the Secretary under the Act require not only the filing of a schedule of charges but also the filing of a statement of any proposed change, together with the reason therefor, and it is required that such charges be conspicuously posted in the principal office of the warehousemen.

Defendants contend that there is no conflict between the two authorities because the authority to initiate or fix rates is solely a matter for the state and the Secretary has only the power to determine when rates are unreasonable or exorbitant, in other words, what might be termed a veto power. We think the contention is not tenable. It must be remembered that one of the conditions upon which the Secretary is authorized to issue a license is the showing by the applicant therefor that the charge which the latter proposes to make is not unreasonable or exorbitant. This is a matter solely for the determination of the Secretary. Assuming that the state authority has the right to fix such rate, it would of course have the right to determine a rate higher than that determined by the Secretary to be not unreasonable or exorbitant. In such a situation the warehouseman would be subjected to the penalty provided for a failure to comply with the state rate, and at the same time in order to procure or retain a federal license he would be compelled to violate such rate. Certainly a warehouseman could neither fix nor raise his charge without the approval of two separate and distinct authorities. We suppose that the essential function of a rate making body is to determine rates which will be fair both to the utility and to the public, and it appears plain that the Secretary is vested with the authority to accomplish such purpose.

It was charged in the Rice complaint that plaintiffs or some of them violated Article XIII of the Illinois Constitution by dealing in grain owned and stored by them in their own warehouses. This provision of the Illinois Constitution was sustained in Hannah v. People, 198 Ill. 77, 64 N.E. 776. Affidavits filed in support of plaintiffs' bill disclose that several million bushels of grain were stored in plaintiffs' warehouses which were owned by them and for which receipts had been issued under federal authority. § 18 of the Act, § 260, 7 U.S.C.A., provides for the contents of receipts, and Par. (i) states, "If the receipt be issued for agricultural products of which the warehouseman is owner, either solely or jointly or in common with others, the fact of such ownership" shall be shown. It is argued that this provision does not authorize a federally licensed warehouseman to store his own grain. We think it does. The fact that the Secretary has permitted such storage indicates that he has so construed the Act. To sustain defendants' contention on this point would immediately invalidate receipts of the value of millions of dollars. It would seriously impair one of the main purposes of the Act, that is, the integrity of warehouse receipts.

Plaintiffs were charged with discrimination against Rice, public grain producers, owners, shippers, dealers, etc., and with granting preferences and advantages to the federal government and agencies thereof, contrary to a provision of the Utility Act of Illinois. The manner of the alleged discrimination is not stated except it is asserted that the federal government and its agencies are charged a lower rate than that charged Rice.

§ 13 of the Act, § 254, 7 U.S.C.A., prohibits the discrimination by warehousemen and provides for storage "without making any discrimination between persons desiring to avail themselves of warehouse facilities." It would appear that this provision gives the Secretary authority to prevent discriminations either in favor of or against any person employing warehouse

facilities. Although it appears that plaintiffs have favored the federal government and its agencies in the storage of grain, it is shown that the Secretary had knowledge thereof and acquiesced therein.

It was charged that some of plaintiffs received undue preferences and discriminated by mixing high quality grain with their own inferior grain, sacrificing part of storage charges to effect purchases and sale of grain, and rebating storage charges, retaining desirable transit tonnage for their own use, storing their own grain in warehouses with more reasonable insurance rates and unduly delaying loading of grain, all in violation of provisions of the Utility and Grain Warehouse Acts of Illinois. These are all matters, in our judgment, completely within the sphere of the federal regulatory power. As already noted, the federal Act permits a warehouseman to store his own grain, and the Secretary is authorized to prevent discrimination. In addition, § 15 requires inspection and grading of fungible agricultural products stored in the federally licensed warehouses; § 16 prohibits the mixing of fungible agricultural products of different grades; § 30 provides for fine and imprisonment for the fraudulent grading of agricultural products stored under the Act, and § 21 requires that stored products be delivered upon proper demand without unnecessary delay.

Plaintiffs or some of them were charged with maintaining unsafe, inadequate and inefficient warehouses, resulting in exorbitant and prohibitive insurance rates and in rendering inefficient service resulting in a deterioration of the grain stored in such warehouses. § 3 of the Act authorizes the Secretary of Agriculture: (1) " * * * to determine whether warehouses for which licenses are applied for or have been issued under this Act are suitable for the proper storage of any agricultural product or products," and (2) " * * * to prescribe * * * the duties of the warehousemen conducting warehouses licensed under this Act with respect to their care of and responsibility for agricultural products stored therein." § 23 requires a warehouseman to make reports to the Secretary concerning the condition, contents, operation and business of a warehouse in such form and at such times as the Secretary may require. § 24 authorizes the Secretary to examine agricultural products stored in licensed warehouses and publish his findings. It appears that the affirmative authority thus conferred upon the Secretary by §§ 3, 23 and 24 is such as to give him control over the warehouses and the grain stored therein in the manners complained of in this paragraph.

Plaintiffs were charged with rendering services without filing and publishing rates, rules and regulations as required by the state. Under regulation 5, § 3 of the Regulations, a federal licensee is required to file with the Secretary a schedule of charges to be made as well as a copy of the rules under which he operates. The regulation further provides that a copy of such rules and schedule of charges must be posted in the principal office of a warehouseman.

Another charge against plaintiffs was that they or some of them abandoned and discontinued service without the approval of the Commission. § 5 of the Act provides for the termination of a federal license for failure to comply with the terms of the Act. As already shown, § 3 authorizes the Secretary to determine the suitability of a federal warehouse for the storage of agricultural products. It thus appears that the Secretary is authorized to determine when a warehouse should be abandoned, and that such determination is enforceable by revocation of the license. The mere issuance of a federal license carries with it the representation of a determination by the Secretary that the warehouse is suitable for the storage of grain. Suppose the Commission should find that the same warehouse should be abandoned. We think this would present a direct conflict between the Secretary and the Commission. Suppose on the other hand that the warehouseman holding a federal license desires to abandon the service. Being under bond exclusively to the federal agent, he could only do so by satisfying the bond and surrendering his license. When that was accomplished, control would revert to the state and the Commission.

The complaint further charged the plaintiffs with charging unjust, unreasonable and discriminatory rates, operating without a state license and mixing public grain with grain of different grades. We have already referred to the authority of the Secretary concerning these matters and we need not discuss them further. It is sufficient to state that we are of the view that the Secretary has express authority over such matters and that any authority exercised by the state would be directly in conflict therewith.

Finally, plaintiffs were charged with having violated the Illinois Statute by failing to secure approval of the Commission of contracts with affiliates, with other public utilities and by failing to obtain authority to issue securities. While we find nothing in the Act which expressly relates to such matters, we think, for the reasons already stated, that the Secretary has implied authority to deal therewith.

In our view, all of the matters charged in the Rice complaint, on which the Commission has assumed jurisdiction and is about to act, concern directly or indirectly the operation of federally licensed warehouses and the storage of grain therein for which receipts are issued. The allowance of such relief by the Commission on the charges thus made would conflict with the Warehouse Act or "plainly and palpably infringes its policy." The exercise of such authority by the Commission would thwart the primary purpose which Congress sought to accomplish. Thus viewing the situation it follows that the order appealed from must be, and is hereby, reversed, with directions to overrule the defendants' motion to strike the complaint and to proceed in accordance with the views herein expressed.

This brings us to a consideration of the appeal in No. 8897, which we think may be disposed of in rather short order. This is so, as we view the situation, because our conclusion in No. 8898 is largely and perhaps completely determinative of that which must be reached on this appeal.

The Board of Trade relies upon the Commodity Exchange Act, §§ 1–17a, Title 7 U.S.C.A., as conferring upon the Secretary of Agriculture exclusive jurisdiction of all regulatory authority over it and similar instrumentalities. The provisions of the Act as well as the rules and regulations promulgated under the authority contained therein are lengthy and we think it is not necessary to set them forth or discuss them in detail. It is sufficient to state that we have given them careful consideration and think that Congress intended and expressly provided for exclusive federal control and authority over the agencies to which the Act is applicable, including the Board of Trade.

As shown in our discussion of appeal No. 8898, the Commodity Exchange Act is closely related to the United States Warehouse Act; in fact, in some instances the provisions of the two Acts are overlapping. The gist of the Rice charge of which the Commission has assumed jurisdiction is:

"The Chicago Board of Trade has from time to time during the last ten years adopted new rules and regulations, and amended existing rules and regulations, relating to the warehousing of grain in public warehouses and the custody of grain in private warehouses, without securing the approval of the Illinois Commerce Commission before placing said new or amended rules and regulations in effect. Such action constitutes a violation of Section 194b of the Illinois Grain Warehouse Act."

The relief prayed for before the Commission was:

"Declare inoperative and void such rules and regulations of the Chicago Board of Trade, or amendments thereto, which have not received prior approval of the Illinois Commerce Commission, and further require said Chicago Board of Trade to adopt and submit for approval, rules and regulations which are fair, equitable, adequate and specific."

Not only was the charge predicated upon § 194b of the Illinois Grain Warehouse Act, Ill.Rev.Stats.1941, Chap. 114, § 194b, but it is conceded that this is the sole provision which confers or purports to confer any authority in the Commission over the Board of Trade.

§ 194b provides:

"No rule or regulation of any board of trade or grain exchange which relates to the warehousing of grain in any public grain warehouse, or which relates to the custody of grain in any private warehouse, or the use or negotiation of custodian's receipts for such grain, shall be or become operative until such rule or regulation is approved by the Illinois Commerce Commission, and the Illinois Commerce Commission may adopt and promulgate reasonable rules and regulations consistent with the provisions of this Act for the purpose of making this Act effective."

As we read this provision, the authority of the Commission is limited to (1) warehousing of grain in any public warehouse, (2) the custody of grain in any private warehouse, and (3) the use or negotiation of custodian's receipts for such grain. In short, it has to do only with the warehousing of grain and the use of warehouse receipts.

As we have shown in appeal No. 8898, the Secretary of Agriculture has exclusive authority over warehouse receipts, including the terms or contents thereof, as well as the storage of grain against which such receipts are issued and the warehouse in which such grain is stored. Again we call attention to § 5a, 7 U.S.C.A. § 7a (7), of the Commodity Exchange Act which provides that receipts issued under the United States Warehouse Act "shall be accepted in satisfaction of any futures contract, made on or subject to the rules of such contract market, without discrimination and notwithstanding that the warehouseman issuing such receipts is not also licensed as a warehouseman under the laws of any state or enjoys other or different privileges than under State law." This provision, as we understand, makes it mandatory that the Board of Trade accept receipts issued under the authority of the United States Warehouse Act, even though the warehouseman is not licensed by the state.

■ It is plain, so we think, that any rule or regulation promulgated by the Board of Trade relative to its transactions in warehouse receipts must conform to and be consistent with the requirements of the federal authority in connection therewith. Any rule or regulation in conflict with or in excess of such authority would be invalid, and this would be so whether or not it was approved by the Illinois Commission. It is equally plain that any rule or regulation promulgated by the Commission concerning the same subject matter, which conflicted with or exceeded the power vested in the federal authority, would be of no effect. We therefore are of the view that Congress has invaded the precise field occupied by the Illinois Commission by reason of § 194(b) of the Illinois Grain Warehouse Act and has rendered its authority inoperative.

It follows that the order appealed from must also be reversed as to the Board of Trade. It is so ordered, with directions to overrule the defendants' motion to strike the complaint and to proceed in accordance with the views herein expressed.