**APPLEY BROTHERS, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. CIV 92–4037.

United States District Court,
D. South Dakota,
Southern Division.

Dec. 6, 1996.

Jonathan K. VanPatten, U.S.D. School of Law, Vermillion, SD, for plaintiffs Appley Brothers; Appley Farms, Inc.; Kevin Beerman; Tom Curry; Dakota Eastern Ltd.; Raymond Hall; Hayes & Hayes, Inc.; Sam

Hatton; Robert Hebeler; Dean Hebeler; Heckathorn Farms, Inc.; Curt Jervik; Dennis Kjose; Gordon Kleihauer; David Larsen; Morris Larsen; Todd Larsen; Lyle Lawrensen; Eldean Lykken; Martin McInerney; Lawrence McInerney; Daniel O'Connor; Kelly O'Connor; Owen Quall; Burnette Quam; Mark Quam; Lyle Wagner; Hurley Elevator.

Glenn L. Roth, Freeman, SD, for Plaintiffs Kaylor Grain Co., Inc., Viborg Coop Elevator.

James M. Cremer, Bantz, Gosch, Cremer, Peterson & Sommers, Aberdeen, SD, for Plaintiff Transamerica Insurance Co.

John J. Ulrich, U.S. Attorney's Office, Sioux Falls, SD, Bertha R. Mitrani, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, Peter Bonner, International Affairs, Department of Agriculture, Office of General Counsel, Washington, DC, for U.S.

## MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

Pending before the Court following a court trial are two issues: (1) whether sellers of grain to Bird Grain Elevator fall within the scope of the United States Warehouse Act to entitle them to damages from the United States in this action brought under the Federal Tort Claims Act, and (2) whether the United States is entitled to an offset against plaintiffs' tort damages in this action for the interest amounts previously paid to plaintiffs on partial payments of their claims, either as a result of the federal liquidation of Bird Grain Elevator or as a result of the state distribution of proceeds from the elevator's grain dealer's bond.[1] For the reasons stated below, the Court holds that sellers of grain fall within the scope of the United States Warehouse Act to entitle them to tort damages in this suit and that the United States is

not entitled to an offset for interest amounts previously paid to plaintiffs.

In a prior Memorandum Opinion and Order on liability issues, the Court held that the United States breached a common law duty to the sellers and depositors of grain at Bird Grain Elevator when Warehouse Examiner John Iten failed to exercise due care in conducting an August 5, 1988 special examination. *Appley Bros. v. United States*, 924 F.Supp. 944, 963–64 (D.S.D.1996). In so holding, the Court determined that Congress intended to benefit sellers and depositors of grain when it adopted the United States Warehouse Act, and that all plaintiffs relied upon federal inspections of Bird Grain Elevator to protect their interests. *Id.* at 963.

■ The United States argues that the Court inappropriately relied upon legislative history to include within the protective scope of the Warehouse Act those plaintiffs who sold grain to the elevator. The government contends that the statutes unambiguously refer only to "storage" of grain. *See* 7 U.S.C. §§ 242–44, 248, 252, 254–56, 259–60. Thus, the United States argues, because the government owed no duty to sellers or merchandisers of grain, any plaintiffs who sold grain to the elevator cannot recover tort damages.

While the statutes refer often to "stored" grain, Congress expressly stated that the Act applies to any warehouse in which any agricultural product *"is or may be stored for interstate or foreign commerce [.]"* 7 U.S.C. § 242 (emphasis added); *Greater Baton Rouge Port Comm. v. United States*, 287 F.2d 86, 90 (5th Cir.1961) (reciting language of § 242 and observing in dicta that primary concern of Warehouse Act "is to establish standards for the safe storing of agricultural products in federally licensed warehouses."), *cert. denied*, 368 U.S. 985, 82 S.Ct. 600, 7 L.Ed.2d 523 (1962). This case thus turns upon whether, as the government argues, the word "stored" means a bailment of specific lots of grain, or whether, as the plaintiffs

---

1. Plaintiffs withdraw from consideration whether plaintiff Lyle Wagner is collaterally estopped from contesting the United States Department of Agriculture's 1991 determination that he is a merchandiser of grain. (Pl.Exs. 2–4, Def.Exs. A, B.) Based on the testimony and exhibits present-

ed at the September 27, 1996 court trial, the Court found orally on the record at the conclusion of the trial that Wayne Heckathorn holds a valid claim for 8,535 bushels of soybeans. (Pl. Exs. 1, 9.)

argue, the word "stored" should be understood more broadly to refer to grain held for future shipment in interstate or foreign commerce, whether sold or stored at the elevator.

As the plaintiffs point out, the regulations promulgated under the Act envision a broader view of federal authority with respect to grain merchandising activities at federally licensed warehouses than the government seems willing to admit in this suit. "Nonstorage grain" is defined as:

> Grain received temporarily into a warehouse for conditioning, transferring, assembling for shipment, or lots of grain moving through a warehouse for current merchandising or milling use, against which no receipts are issued and no storage charges assessed: *Provided,* That merchandising or milling stocks held in storage as reserve stocks, or stored for use at an indefinite future date, may not be treated as nonstorage grain.

7 C.F.R. § 736.2(k). Another regulation provides that "all storage and nonstorage grain received into the warehouse shall be inspected, graded and weighed by a licensed inspector and/or weigher—and no receipt may be issued under the Act or the regulations in this part until the grain covered by such receipt has been so inspected, graded, and weighed." 7 C.F.R. § 736.19(a). Warehouse receipts are not issued for nonstorage grain, but the warehouseman is required to "keep accurate records of the weights, kinds, and grades of all lots of nonstorage grain received into and delivered from the warehouse[,]" and, in the event the purpose for which the grain was received into the warehouse changes "so that its approximate delivery period from the warehouse becomes indeterminate, receipts shall be issued to cover such grain." *Id.* The warehouseman is required to keep records pertaining to nonstorage grain for "a period of one year after December 31 of the year in which the lot of nonstorage grain is delivered from the warehouse." *Id.* The warehouseman must keep a system of accounts for storage and nonstorage grain alike, 7 C.F.R. § 736.37, and he must deliver grain in accordance with the grade assigned upon weighing, grading, and

acceptance into the warehouse. 7 C.F.R. § 736.44.

Even the government's witness, Steven Mikkelsen, Chief of the Licensing Authority Branch, Warehouse and Inventory Division, admitted that all grain arriving at a federally licensed warehouse is initially treated as stored grain under the provisions of the Act and its regulations. (Court Trial Testimony of Steven N. Mikkelsen at 31.) He also testified the United States Department of Agriculture determined that twenty-five of twenty-seven plaintiffs in this case held valid storage claims for grain delivered to Bird Grain Elevator even though those plaintiffs did not hold warehouse receipts for the grain, as would be contemplated by the Act and regulations. (Court Trial Testimony of Steven N. Mikkelsen at 23, 31.)

In *United States v. Kirby,* 587 F.2d 876, 880 (7th Cir.1978), a criminal case brought by the federal government against two defendants for mail fraud, false statements, and bribery of federal grain inspectors, the Seventh Circuit rejected the argument that the government makes here. In *Kirby,* the defendants contended that they could not be found guilty of bribery because the grain inspectors were not public officials as contemplated by the federal bribery statute. *Id.* at 879. In ruling that the inspectors were public officials, the Seventh Circuit held that the federal regulations promulgated under the Warehouse Act "explicitly adopt a broad, nontechnical interpretation of 'stored' grain to include all grain kept in a licensed warehouse, not merely grain which is held as a bailment and for which warehouse receipts have been issued[,]" and further, that a broad interpretation of the word "stored" is a correct reading of statutory language. *Id.* at 880. Defendants asserted, as does the government here, that "the purpose of the Act was to foster confidence in warehouse receipts for grain stored as a bailment in order to facilitate financing." *Id.* Like this Court, the Seventh Circuit looked to legislative history to determine that Congress passed the Act to protect the agricultural commodities themselves and to establish consistent standards. *Id.* The appeals court concluded that it was immaterial whether the grain was

purchased by or stored at the warehouse because storage of purchased grain in the warehouse "brings the Act into play." *Id.*

The Court will follow the analysis of *Kirby* because the Seventh Circuit carefully reasoned the legal issue, and the result reached appears to be consistent with congressional intent, as this Court previously held. *See also Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 229, 67 S.Ct. 1146, 1151–52, 91 L.Ed. 1447 (1947) (noting that warehouses engaged in storage of grain for interstate or foreign commerce are in federal domain and holding that Warehouse Act preempts state regulation); *In re Farmers Cooperative Ass'n,* 69 S.D. 191, 8 N.W.2d 557, 561–62 (1943) (holding that dominant words in § 242 are "stored for interstate ... commerce" and warehouses storing great bulk of South Dakota wheat intended for interstate commerce when produced fall exclusively within federal Warehouse Act).

The Court will not follow *In re Julien Co.,* 44 F.3d 426, 431 (6th Cir.1995), because the Sixth Circuit did not engage in the same careful legal analysis of the issue that the Seventh Circuit conducted. The Sixth Circuit, like the government in this case, focused only upon the word "stored" as used in the statutes without considering what Congress meant, particularly in § 242, when it used the broader phrase "stored for interstate or foreign commerce." The court also failed to consider the reasoning of *Kirby,* decided in 1978, when the court erroneously stated that "[c]ase law fails to clarify whether the Warehouse Act applies to situations that do not involve the issuance of a warehouse receipt." *Id.* Therefore, the Court reaffirms its previous ruling that plaintiffs who sold grain to Bird Grain Elevator fall within the protection of the Warehouse Act. Examiner Iten owed a common law duty of care to all plaintiffs, whether sellers or depositors, and all plaintiffs are entitled to claim damages for the government's negligence in this tort action.

■ The government next contends that interest amounts included with previous partial payments of principal to the plaintiffs from liquidation or bond proceeds should be offset against the government's tort damages. The government provides no legal authority for its position.

Damages in this federal tort claims action are to be determined in accordance with South Dakota law. *See Knowles v. United States,* 29 F.3d 1261, 1263 (8th Cir.1994) (FTCA case arising in South Dakota). Plaintiffs agree that they are not entitled to prejudgment interest on any FTCA damages awarded to them. *See* 28 U.S.C. § 2674. Plaintiffs correctly argue, however, that the United States is entitled to an offset for interest previously paid to plaintiffs if the United States would be entitled to an offset under South Dakota law. *See* 28 U.S.C. § 1346(b); *Branch v. United States,* 979 F.2d 948, 952 (2d Cir.1992).

Under state law, interest represents the time value of money that has been withheld. South Dakota Codified Laws Ann. § 21–1–13.1; *Honomichl v. Modlin,* 477 N.W.2d 599, 602 (S.D.1991); *Arcon Constr. Co. v. South Dakota Cement Plant,* 405 N.W.2d 45, 47 (S.D.1987). Plaintiffs waited at least three years after the closure of Bird Grain Elevator before they received partial payments toward their losses. The Department of Agriculture and the South Dakota Public Utilities Commission paid plaintiffs pro rata shares of their claims, with interest, from the proceeds of the federal liquidation and from the $50,000 state grain dealer's bond. These pro rata payments were based upon plaintiff's valid grain storage claims and valid grain sale contracts. The gratuitous payment of interest to plaintiffs was to compensate them for the lost time-value of money and not to satisfy any portion of their underlying losses. Those interest payments should not now be used against plaintiffs in this action. Plaintiffs have waited an additional five years to receive full compensation for their losses. By statute, they are prohibited from claiming prejudgment interest on tort damages awarded in this case. Because interest amounts were previously paid in recognition of the lost time-value of money to plaintiffs, the United States cannot offset those interest amounts against the damages to be paid in this case.

At the court trial in this matter, counsel for the parties represented to the Court that,

except for the two issues determined in this Opinion, they had reached agreement on all other issues pertaining to the amount of damages due each plaintiff in this matter. Accordingly,

IT IS ORDERED:

(1) that all plaintiffs, both sellers and depositors, fall within the protection of the United States Warehouse Act and are entitled to an award of tort damages in this action.

(2) that the United States may not apply as an offset against the tort damages due to each plaintiff in this case the amount of interest previously paid to that plaintiff from proceeds of the federal liquidation or the state grain dealer's bond.

(3) that counsel for the parties will file with the Clerk within ten days after service of this Order their stipulation as to the amount of tort damages due to each plaintiff in this matter.

(4) that, upon receiving counsel's stipulation on damages, the Court will enter Judgment in favor of plaintiffs.